[Civ. No. 22024. Third Dist. Sept. 2, 1982.]

ELIZABETH E. MAXON, as Public Guardian, etc., Petitioner, v. THE SUPERIOR COURT OF BUTTE COUNTY, Respondent; ALEXANDRA ELLEN HURLBUT, Real Party in Interest.

**COUNSEL**

Delbert M. Siemsen, County Counsel, and Harvey Wallace, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Warren, Schroder & Mueller and Kenneth Anderson for Real Party in Interest.

**OPINION**

**SPARKS, J.**—Probate Code section 2356, subdivision (d), prohibits the court from authorizing the sterilization of a conservatee. The issue in this writ proceeding is whether this statutory proscription prevents the superior court from authorizing a lifesaving surgical operation which incidentally renders the conservatee sterile. We hold that it does not.

Petitioner, the Butte County Public Guardian, seeks a writ of mandate directing the superior court to vacate its order denying a petition for authority to give consent for medical treatment. We conclude that the trial court abused its discretion and shall order a peremptory writ to issue.

I

Petitioner was appointed as the conservator of Alexandra Ellen Hurlbut, real party in interest, on October 5, 1981, under the provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5350 et seq.).[1] In February 1982 petitioner was advised that Alexandra showed evidence of possible cervical cancer. On March 9, 1982, petitioner received a letter from Deepak Stokes, M.D., stating that a cone biopsy of the cervix and the endometrial curettages on Alexandra, done on February 19, 1982, showed, "severe squamous dysplasia and fragments of dysplastic cervical epithelium." Doctor Stokes advised petitioner that this condition required that Alexandra have a total abdominal hysterectomy. Alexandra was also examined by another gynecologist, Dr. Loring, and he too recommended a hysterectomy.

On April 7, 1982, petitioner obtained an order from the superior court authorizing a third medical examination of Alexandra. This examination was conducted by Dr. Leland Fillerup, an eminent gynecologist. He conducted a pelvic examination of Alexandra on April 8, 1982. Dr. Fillerup similarly diagnosed her condition to be one of premalignant cancer and also recommended that she undergo a hysterectomy. It was the doctor's opinion that if a hysterectomy were not performed the situation would become life-threatening.

On March 23, 1982, petitioner filed a petition for authority to give consent for the recommended medical treatment.[2]

---

[1]Under that act a conservatorship may be established for a person who is gravely disabled as a result of mental disorder. (Welf. & Inst. Code, § 5350.) "Gravely disabled" means "[a] condition in which a person, as a result of mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter;" (Welf. & Inst. Code, § 5008, subd. (h)(1)). With stated exceptions, the procedures for administering LPS conservatorships are the same as those provided for probate conservatorships. (Welf. & Inst. Code, § 5350.)

[2]Welfare and Institutions Code section 5358 provides that, "Except in emergency cases in which the conservatee faces loss of life or serious bodily injury, no surgery shall be performed upon the conservatee without the conservatee's prior consent or a

On April 12, and on May 3, 1982, hearings were conducted in the superior court upon petitioner's motion to obtain an order that the hysterectomy be performed upon Alexandra.[3] Dr. Fillerup testified that cancer of the cervix accounts for approximately 12 percent of all deaths in women. In his words, "[it] is one of the more malicious types of cancer. It's infiltrative type of cancer, invading into the vagina, into the bladder, into the surrounding pelvic organs, the rectum. It's a very, very miserable and rather prolonged, slow growing type of cancer by and large."

court order specifically authorizing such surgery obtained pursuant to section 5358.2." Section 5358.2 of that code provides "If a conservatee requires medical treatment which has not been specifically authorized by the court, the conservator shall, after notice to the conservatee, obtain a court order for such medical treatment, except in emergency cases in which the conservatee faces loss of life or serious bodily injury. The conservatee, if he chooses to contest the request for a court order, may petition the court for hearing which shall be held prior to granting the order."

Similar, but more comprehensive, provisions govern probate conservatorships. Probate Code section 2357, subdivision (b), provides that if the conservatee requires medical treatment for an existing or continuing medical condition, the treatment is not otherwise statutorily authorized and the conservatee is unable to give an informed consent to that treatment, the conservator may petition the probate court for an order authorizing the medical treatment and the conservator's consent to it. Section 2354, subdivision (c), of that code authorizes a conservator to consent to medical treatment to be performed upon the conservatee, "where the conservator determines in good faith based upon medical advice that the case is an emergency case in which medical treatment is required because ... the conservatee has a medical condition which, if not immediately diagnosed and treated, will lead to serious disability or death."

Under the provisions of Probate Code section 2357, the court may make an order authorizing the recommended course of medical treatment and authorizing the conservator to consent on behalf of the conservatee, "if the court determines from the evidence all of the following: [¶] (1) The existing or continuing medical condition of the ward or conservatee requires the recommended course of medical treatment. [¶] (2) If untreated, there is a probability that the condition will become life-endangering or result in a serious threat to the physical health of the ward or conservatee. [¶] (3) The ward or conservatee is unable to give an informed consent to the recommended course of treatment."

Although Alexandra's condition is potentially life-threatening, her case is not an emergency one in the sense that if the operation is not performed today she will die tomorrow. Here there was adequate time to seek the court's approval and a petition was therefore required.

Petitioner proceeded under Probate Code section 2357 and the court made factual findings under its provisions. Consequently, we need not now decide whether the more protective procedures contained in that section are supplemental to those set forth in Welfare and Institutions Code section 5358.2. (See Law Revision comment to Prob. Code, § 2357; see also *Guardianship of Tulley* (1978) 83 Cal.App.3d 698, 705 [146 Cal.Rptr. 266]: "It is likewise beyond dispute that when, as here, the deprivation of rights comprises a serious invasion of one's privacy and well being, the state is not only entitled, but also mandated to provide adequate procedural safeguards to ensure the avoidance of potential abuses (cf. *Wyatt v. Aderholt* (M.D.Ala. 1974) 368 F.Supp. 1383)."

[3]At the hearing Alexandra was represented by the Butte County Public Defender's Office.

Although the progression of this precancerous condition is not rapid and dramatic, once it "becomes cancerous and it becomes what we call invasive cancer, in other words it goes beyond the base membrane of the cells," the doctor explained, "then it changes the whole entire perspective and the entire therapy. [¶] Instead of a surgical treatment where we excise the uterus and the cervix and the effect, 99.9 percent cure rate, we then are dealing with invasive cancer and the treatment of choice for that particular cancer is radiation therapy. [¶] So we have changed rather remarkably the care of the patient. Also [involved are] the related complications secondary to radiation, effects upon the bladder, upon the bowels."

Dr. Fillerup further concluded that although normally there are two alternatives to a hysterectomy, these were not manageable options in this case because Alexandra was unwilling to cooperate with followup medical treatment and examination. With a mentally sound patient, one of these two conservative procedures might be recommended. The first, cryosurgery, involves freezing the cervix and requires medical examinations at three month intervals for a period of some three years. The second, conization of the cervix, is a surgical procedure in which the tissue in question is excised. It also necessitates a very close medical followup to insure that there has not been a recurrence and progression of the treacherous condition. Both of these alternative procedures require that the patient be examined with a colposcope. If the patient, Dr. Fillerup expounded, is "uncooperative there is no possible way you could do an adequate colposcopy, where we visualize this with a powerful microscope. And the patient has to be very cooperative. And if there is motion or anything it would be impossible for you to visualize it." The record also reflects that, because of her mental instability, Alexandra is a hostile and resistant patient. With such an uncooperative patient the only way to conduct a colposcopy, the doctor concluded, is to forcibly administer a general anesthesia. And, again in the words of the physician, when "you're talking about a general anesthesia then you're talking about every three quarters of the year putting this patient to sleep to accomplish this. And that seems almost overkill for the problem involved considering the hazards with anesthesia."

The doctor also provided detailed testimony to the effect that if the hysterectomy is not performed there is an 80 percent chance that cervical cancer will occur. However, if the recommended surgery is conducted upon Alexandra, it will be nearly 100 percent effective in elimi-

nating the potential danger of cancer. Finally, he stated that, although the surgical procedure would render Alexandra incapable of bearing children, the sole purpose of the hysterectomy is to prevent cancer and not to cause sterility.

Both Alexandra's father and mother stated at the hearing that they agreed that a hysterectomy should be performed on their adult daughter.[4]

At the conclusion of the hearing, the court made the following findings pursuant to Probate Code section 2357, subdivision (h):

1. The existing medical condition of Alexandra requires the recommended course of medical treatment;

2. If not treated, there would be an 80 percent probability that Alexandra's condition would become life-endangering;

3. Alexandra is unable to give her informed consent to such an operation;

4. A hysterectomy would be most appropriate treatment and would be in the best interest of the health, welfare and protection of Alexandra; and

5. Due to her mental condition, the conservative treatment alternatives to a hysterectomy, i.e., cryosurgery and conization, were not feasible options.

Despite these findings, the court was of the opinion that Probate Code section 2356, subdivision (d), which provides that "No ward or conservatee may be sterilized under the provisions of this division," prevented it from ordering that a hysterectomy be performed upon Alexandra. ■ We conclude that the trial court misconstrued the prohibition of that section. It prohibits a sterilization operation when the purpose of the operation is to render the patient incapable of procreating or when it is not medically or surgically necessary for the treatment of a life-endangering disease.

---

[4]In outbursts at the hearing, Alexandra claimed she was too old and weak to bear children, was already sterile and earlier "had it sewed up." All of these claims were rebutted by the medical testimony.

## II

Over half a century ago it was believed that sterilization of the unfit would promote the general health and welfare of our society. (See *Buck v. Bell* (1927) 274 U.S. 200, 207 [71 L.Ed. 1000, 1002, 47 S.Ct. 584].) In recent times, there has been a growing realization that sterilization procedures may be greatly abused. (See *Stump* v. *Sparkman* (1978) 435 U.S. 349 [55 L.Ed.2d 331, 98 S.Ct. 1099]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110]; *Downs* v. *Sawtelle* (1st Cir. 1978) 574 F.2d 1; Grosboll, *Sterilization Abuse: Current State of the Law and Remedies for Abuse* (1980) 10 Golden Gate L.Rev. 1147; Burgdorf & Burgdorf, *The Wicked Witch is Almost Dead: Buck v. Bell and the Sterilization of Handicapped Persons* (1977) 50 Temp.L.Q. 995; Comment *Eugenic Sterilization Statutes: A Constitutional Re-evaluation* (1975) 14 J.Fam.L. 280; Ferster, *Eliminating the Unfit—Is Sterilization the Answer?* (1966) 27 Ohio St.L.J. 591.) Although *Buck* v. *Bell* has not been explicitly overruled, we agree with the assessment of the Colorado Supreme Court that "[t]oday, compulsory sterilization of incompetents based on eugenic theories can no longer be justified as a valid exercise of governmental authority . . . ." (*In the Matter of A.W.* (1981) — Colo. — [637 P.2d 366, 368].) Courts now recognize that the constitutional rights at stake, a woman's right to freedom from unwarranted governmental intrusion and to choose whether to bear children, are of a *fundamental* nature. (See *Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 273-275 [172 Cal.Rptr. 866, 625 P.2d 779].)

Thus in *Guardianship of Tulley, supra*, 83 Cal.App.3d 698, a guardian sought an order of the court authorizing the sterilization of his daughter because of her profound mental retardation. In affirming the denial of that request, the Court of Appeal stated: "To begin with, it has been widely recognized that sterilization (even if medically and socially indicated) is an extreme remedy which irreversibly denies a human being the fundamental right to bear and beget a child. Accordingly, the overwhelming majority of courts hold that the jurisdiction to exercise such awesome power may not be inferred from the general principles of common law, but rather must derive from specific legislative authorization. The position of case law is thus clear that in the absence of specific statutory authority the courts may not order the sterilization of a mentally defective person [citations]." (*Id.*, at p. 701.)

Earlier, in *Guardianship of Kemp* (1974) 43 Cal.App.3d 758 [118 Cal.Rptr. 64, 74 A.L.R.3d 1202], the court had held that the superior court sitting as a probate court was a court of limited jurisdiction and that, in the absence of statutory authority, it lacked jurisdiction to order the involuntary sterilization of a severely impaired ward.

The California Legislature has reached similar conclusions. In 1979 it repealed former Welfare and Institutions Code section 7254, a statute which permitted, under certain limited conditions, the sterilization of some mentally disordered or mentally retarded persons committed to mental hospitals. (Stats. 1979, ch. 552, § 1, p. 1762.) That same year it enacted the statute in question, Probate Code section 2356, subdivision (d), to further deter the probate court from ordering the sterilization of incompetents for the purpose of preventing mentally defective persons from procreating. The Law Revision Commission comment to this section noted that "Subdivision (d) is consistent with Guardianship of Tulley, 83 Cal.App.3d 698, 146 Cal.Rptr. 266 (1978), and Guardianship of Kemp, 43 Cal.App.3d 758, 118 Cal.Rptr. 64 (1974)." Consequently the statute is inapplicable in cases in which the purpose of proposed surgery is to protect the life of the incompetent rather than to prevent her from bearing children.[5]

The medical testimony in this case reveals that there is virtually no chance that Alexandra will contract the malignant disease if the hysterectomy is performed. On the other hand, if the hysterectomy is not performed she has at least an 80 percent chance of contracting cervical cancer, one of the most virulent and deadly types of malignancy. It would be incongruous and contrary to the clear intent of the Legislature to construe Probate Code section 2356, subdivision (d), as prohibiting the court from ordering a surgical operation when it is a lifesaving necessity. Indeed, Alexandra's constitutional interests in privacy and procreation would be of little value were she to develop fatal cancer of the cervix.

Because we view a hysterectomy as a serious and intrusive invasion of Alexandra's right of privacy, we believe that any such order must be supported by clear and convincing evidence of the medical necessity for

---

[5]We caution that our decision should not be misconstrued as condoning hysterectomy as a general preventative technique for the elimination of all precancerous conditions without regard to the probability that the condition will become life-endangering. We are not here addressing any threat less than probable death and even that only where more conservative medical steps are not feasible.

the operation as well as by a finding that the hysterectomy is the least intrusive means possible to achieve the objective. An elevated standard of proof in a proceeding to determine whether or not such an operation is of "medical necessity" will lessen the possible risk that a factfinder might decide to sterilize an individual on unsubstantiated testimony or discredited eugenic theories. (*Addington* v. *Texas* (1979) 441 U.S. 418, 427 [60 L.Ed.2d 323, 331-332, 99 S.Ct. 1804].) "Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate" operations will be ordered. (*Ibid.*) Our review of the record before us indicates that the trial judge applied the appropriate standard and that his findings are overwhelmingly supported by clear and convincing evidence. (See *In re Robert P.* (1976) 61 Cal.App.3d 310, 319 [132 Cal. Rptr. 5].)

The denial of the recommended medical treatment here will expose Alexandra to an unreasonable risk of death from cervical cancer. Transcending Alexandra's fundamental rights to privacy and to bear children is her paramount right to life itself. It is for this transcendent right to live that we now cast our appellate votes.

Let a peremptory writ of mandate issue directing the superior court to enter an order authorizing the hysterectomy and petitioner's consent to it.

Regan, Acting P. J., and Blease, J., concurred.