[No. A026544. First Dist., Div. One. Sept. 27, 1984.]

LILLIAN F., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
FREDERICK C. KRETZ, As Public Guardian, etc.,
Real Party in Interest.

**COUNSEL**

Sheldon Portman, Public Defender, and David E. Kahn, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Donald L. Clark, County Counsel, and Harrison D. Taylor, Deputy County Counsel, for Real Party in Interest.

**OPINION**

**NEWSOM, J.**—Petitioner, Lillian F., is a conservatee in Santa Clara County. The Public Guardian of that county is her conservator. By this petition for extraordinary relief, she seeks to overturn a March 16, 1984, order of the Santa Clara County Superior Court which determined that she did not have the capacity to give written, informed consent to convulsive treatment. (Welf. & Inst. Code, § 5326.7, subds. (f) and (g).)[1]

The superior court's order was made following an evidentiary hearing on a petition for necessary convulsive treatment filed by the conservator. The petition alleged that Lillian F. was in need of electroconvulsive therapy (hereafter ECT), that the procedures and consequences of the treatment had been discussed with her, and that, according to her physicians, as a result of a mental disorder she was incapable of fully understanding the treatment and of giving written, informed consent to it. Therefore, the conservator sought authorization from the court to give such consent. At the hearing, petitioner expressly requested that the superior court apply a "beyond a reasonable doubt" standard of proof to the question of whether she was capable of giving informed consent to the proposed treatment. Instead, the court determined the question by the "preponderance of evidence" standard and granted the conservator's petition. This request for extraordinary relief

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

followed. Having issued a temporary stay of the lower court's order, we deemed the petition one for writ of mandate and issued our alternative writ. Petitioner contends, and we agree, that the superior court erred in applying the preponderance of the evidence standard of proof to the question of whether or not she was capable of giving written, informed consent to the administration of ECT. We disagree, however, with petitioner's contention that the appropriate standard of proof is that of proof beyond a reasonable doubt. Instead, as will be seen, we hold that the standard of proof applicable to a section 5326.7, subdivision (f), proceeding is that of proof of the conservatee's lack of capacity to consent by clear and convincing evidence.

It will be useful to the present decision to briefly discuss ECT and the statutes regulating its use.

" 'Shock' treatment, more accurately termed 'electroconvulsive therapy' is the name given to a group of therapies which involve passing electrical currents through the brain in order to induce convulsions. The therapeutic effects of ECT are generally believed to be obtained by the seizure produced by the stimulation of the central nervous system. The risks attending such treatment have been greatly reduced by the use of muscle relaxants and general anesthetics, which greatly reduce the body convulsions that led to bone fractures in the past. The mechanism by which ECT confers its benefits is still unknown, but two facts stand out in almost every discussion of the treatment: first, ECT does relieve symptoms of certain mental illnesses, most notably acute depression, and is widely recognized therapy for obtaining remission of those symptoms; second, ECT has several adverse effects, including memory loss and intellectual disorientation. The extent of memory loss and the risk of permanent memory loss are not fully known or agreed upon, but the fact of memory loss is not questioned. The risk of other adverse effects is possible, since the procedure is still so little understood. Those possible risks include permanent brain damage in the local area of the electrodes and a slowing of brain waves. The outstanding features of ECT, then, are its acknowledged benefits in the treatment of certain illnesses, and the intrusive and possibly hazardous character of the treatment." (*Aden* v. *Younger* (1976) 57 Cal.App.3d 662, 672, fns. omitted [129 Cal.Rptr. 535].)

In apparent recognition of the "intrusive" and "possibly hazardous" character of ECT, the Legislature has established a variety of procedural safeguards surrounding the use of the treatment for voluntarily or involuntarily detained patients pursuant to the Lanterman-Petris-Short Act (hereafter LPS Act). (Welf. & Inst. Code, § 5000 et seq.) Thus, section 5325 provides in relevant part that "[e]ach person involuntarily detained for evaluation or treatment under provisions of this part . . . shall have the follow-

ing rights, a list of which shall be prominently posted in the predominant languages of the community and explained in a language or modality accessible to the patient in all facilities providing such services and otherwise brought to his or her attention by such additional means as the Director of Mental Health may designate by regulation: . . . [¶] (f) To refuse convulsive treatment including, but not limited to, any electroconvulsive treatment, any treatment of the mental condition which depends on the induction of a convulsion by any means, and insulin coma treatment."

And, section 5325.1 provides that "[i]t is the intent of the Legislature that persons with mental illness shall have rights including, but not limited to, the following: "(a) A right to treatment services which promote the potential of the person to function independently. Treatment should be provided in ways that are least restrictive of the personal liberty of the individual.

"(b) A right to dignity, privacy, and humane care.

"(c) A right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program.

". . . . . . . . . . . . . . . . . . . . . . .

"(i) A right to be free from hazardous procedures."

Convulsive treatment may not be administered to an involuntary patient such as petitioner unless the extensive requirements of section 5326.7 are met.[2]

---

[2]Section 5326.7 provides: "Subject to the provisions of subdivision (f) of Section 5325, convulsive treatment may be administered to an involuntary patient, including anyone under guardianship or conservatorship, only if:

"(a) The attending or treatment physician enters adequate documentation in the patient's treatment record of the reasons for the procedure, that all reasonable treatment modalities have been carefully considered, and that the treatment is definitely indicated and is the least drastic alternative available for this patient at this time. Such statement in the treatment record shall be signed by the attending and treatment physician or physicians.

"(b) A review of the patient's treatment record is conducted by a committee of two physicians, at least one of whom shall have personally examined the patient. One physician shall be appointed by the facility and one shall be appointed by the local mental health director. Both shall be either board-certified or board-eligible psychiatrists or board-certified or board-eligible neurologists. This review committee must unanimously agree with the treatment physician's determinations pursuant to subdivision (a). Such agreement shall be documented in the patient's treatment record and signed by both physicians.

"(c) A responsible relative of the person's choosing and the person's guardian or conservator, if there is one, have been given the oral explanation by the attending physician as

The informed consent contemplated by the section is expressly defined in section 5326.5.[3]

Finally, the act specifies, in section 5326.2,[4] the information which must be given to a patient prior to that patient's consent to the treatment.

required by Section 5326.2. Should the person desire not to inform a relative or should such chosen relative be unavailable, this requirement is dispensed with.

"(d) The patient gives written informed consent as defined in Section 5326.5 to the convulsive treatment. Such consent shall be for a specified maximum number of treatments over a specified maximum period of time not to exceed 30 days, and shall be revocable at any time before or between treatments. Such withdrawal of consent may be either oral or written and shall be given effect immediately. Additional treatments in number or time, not to exceed 30 days, shall require a renewed written informed consent.

"(e) The patient's attorney, or if none, a public defender appointed by the court, agrees as to the patient's capacity or incapacity to give written informed consent and that the patient who has capacity has given written informed consent.

"(f) If either the attending physician or the attorney believes that the patient does not have the capacity to give a written informed consent, then a petition shall be filed in superior court to determine the patient's capacity to give written informed consent. The court shall hold an evidentiary hearing after giving appropriate notice to the patient, and within three judicial days after the petition is filed. At such hearing the patient shall be present and represented by legal counsel. If the court deems the above-mentioned attorney to have a conflict of interest, such attorney shall not represent the patient in this proceeding.

"(g) If the court determines that the patient does not have the capacity to give written informed consent, then treatment may be performed upon gaining the written informed consent as defined in Sections 5326.2 and 5326.5 from the responsible relative or the guardian or the conservator of the patient.

"(h) At any time during the course of treatment of a person who has been deemed incompetent, that person shall have the right to claim regained competency. Should he do so, the person's competency must be reevaluated according to subdivisions (e), (f), and (g)."

[3]Section 5326.5 provides: "(a) For purposes of this chapter, 'written informed consent' means that a person knowingly and intelligently, without duress or coercion, clearly and explicitly manifests consent to the proposed therapy to the treating physician and in writing on the standard consent form prescribed in Section 5326.4.

"(b) The physician may urge the proposed treatment as the best one, but may not use, in an effort to gain consent, any reward or threat, express or implied, nor any other form of inducement or coercion, including, but not limited to, placing the patient in a more restricted setting, transfer of the patient to another facility, or loss of the patient's hospital privileges. Nothing in this subdivision shall be construed as in conflict with Section 5326.2. No one shall be denied any benefits for refusing treatment.

"(c) A person confined shall be deemed incapable of written informed consent if such person cannot understand, or knowingly and intelligently act upon, the information specified in Section 5326.2.

"(d) A person confined shall not be deemed incapable of refusal solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person.

"(e) Written informed consent shall be given only after 24 hours have elapsed from the time the information in Section 5326.2 has been given."

[4]Section 5326.2 provides: "To constitute voluntary informed consent, the following information shall be given to the patient in a clear and explicit manner:

"(a) The reason for treatment, that is, the nature and seriousness of the patient's illness, disorder or defect.

"(b) The nature of the procedures to be used in the proposed treatment, including its probable frequency and duration.

"(c) The probable degree and duration (temporary or permanent) of improvement or re-

It is clear, then, that the statute contemplates the safeguard of an evidentiary hearing directed to the question of whether the conservatee is able to understand and knowingly and intelligently act upon the information provided him by the attending physician pursuant to section 5326.2.

Notably, subdivisions (f) and (g) of section 5326.7, do *not* specify the standard of proof to be used by the court in making its evidentiary findings. Evidence Code section 115 provides in relevant part that "[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." Evidence Code section 160, however, specifies that "law" includes decisional and constitutional as well as statutory law. Evidence Code section 115 also specifies three different burdens of proof: 1) proof beyond a reasonable doubt; 2) proof by clear and convincing evidence; and 3) proof by a preponderance of the evidence.

■■■ " 'Clear and convincing' evidence requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) Such a test requires that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Sheehan* v. *Sullivan* (1899) 126 Cal. 189, 193 [58 P. 543].)

A preponderance of the evidence standard, on the other hand, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence . . . .' " (*In re Winship* (1970) 397 U.S. 358, 371 [28 L.Ed.2d 368, 379, 90 S.Ct. 1068].)

And, "[i]n criminal proceedings, where the conflicting interests involve an individual's freedom and the state's enforcement of its criminal laws, courts have traditionally been particularly sensitive to the citizen's liberty" (*In re Angelia P., supra,* 28 Cal.3d 908, 918), and have applied the standard of proof beyond a reasonable doubt. Moreover, our state's high court has not hesitated to extend this standard "to those noncriminal situations in which a personal freedom similarly collides with the state's interest in con-

---

mission, expected with or without such treatment.

"(d) The nature, degree, duration, and the probability of the side effects and significant risks, commonly known by the medical profession, of such treatment, including its adjuvants, especially noting the degree and duration of memory loss (including its irreversibility) and how and to what extent they may be controlled, if at all.

"(e) That there exists a division of opinion as to the efficacy of the proposed treatment, why and how it works and its commonly known risks and side effects.

"(f) The reasonable alternative treatments, and why the physician is recommending this particular treatment.

"(g) That the patient has the right to accept or refuse the proposed treatment, and that if he or she consents, has the right to revoke his or her consent for any reason, at any time prior to or between treatments."

finement for the protection of both the public and the individual." (*Ibid.*; see also *Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1].)

■ Our task is to determine the appropriate standard of proof having in mind the nature and purpose of the proceeding, the grave personal intrusion and stigma involved, and the potential deprivation of liberty. (*People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352].)

We must balance a "complex group of interrelated, but perhaps conflicting, interests . . . ." (*In re Angelia P., supra,* 28 Cal.3d 908, 919.) Those interests include the right of the conservatee to effective treatment. (*In re Roger S.* (1977) 19 Cal.3d 921 [141 Cal.Rptr. 298, 569 P.2d 1286]; *In re Ingram* (1978) 76 Cal.App.3d 495, 500 [142 Cal.Rptr. 825].) And that right, we will add, here includes the right to elect or reject a treatment which itself can invade the constitutional right of privacy. As the basic right of privacy implicated has already been eloquently discussed in *Aden* v. *Younger, supra,* 57 Cal.App.3d 662: "The right to be free in the exercise of one's own thoughts is essential to the exercise of other constitutionally guaranteed rights. First Amendment rights of free speech would mean little if the state were to control thought. 'Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds . . . .' [Citation.] Here the state has sought to control neither what is thought by mental patients, nor how they think. Rather, the state is attempting to regulate the use of procedures which touch upon thought processes in significant ways, with neither the intention nor the effect of regulating thought processes, per se. Yet despite the lack of any showing the state has attempted to regulate freedom of thought, this legislation may diminish this right. If so, the legislation can only be sustained by showing (1) it is necessary to further a 'compelling state interest' and (2) the least drastic means has been employed to further those interests [citation].

"Freedom of thought is intimately touched upon by any regulation of procedures affecting thought and feelings. In an effort to protect freedom of thought, the state has put procedural and substantive obstacles in the path of those who both need and desire certain forms of treatment, and in that way their freedom of thought remains impaired because they cannot get treatment. The means of alleviating mental disorders generate their own kinds of fear and misunderstanding. This attitude touches our public affairs; the fact of treatment alone may impair our confidence in people of unquestioned talent and industry. Psychosurgery and (ECT) are viewed, rightly or wrongly, as drastic, radical forms of treatment compared to psychotherapy

or drug therapy, and indicative of more severe illness. Public exposure, or even disclosure to limited numbers of government representatives, may have a chilling effect on patients' efforts to undergo these treatments, thereby restricting their freedom of thought. Some patients will be denied treatment as a natural and intended result of this legislation. Although the reasons for such denials may be the patients' own best interests, such regulation must be justified by a compelling state interest." (*Aden* v. *Younger, supra,* 57 Cal.App.3d 662, 679-680.)

The conservatee's power to refuse medical treatment generally "involves such fundamental rights as one's right to self-determination in the conduct of one's affairs, the right to be left alone (freedom from governmental interference), and the right to the inviolability of one's person. All of these rights fall within the 'zones' of privacy found by implication as a 'penumbral' right in the First, Fourth, Fifth and Ninth Amendments of the United States Constitution. [Citations.]" (58 Ops.Cal.Atty.Gen. (1975) pp. 849, 850.) Of course, California expressly embodies the right of privacy as an inalienable right (Cal. Const., art. I, § 1). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, *unless by clear and unquestionable authority of law.* As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity: to be left alone.' Cooley on Torts, 29." (*Union Pacific Railway Co.* v. *Botsford* (1891) 141 U.S. 250, 251 [35 L.Ed. 734, 11 S.Ct. 1100], italics added.)

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' [Citation.] The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

"Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

"In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional

requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." (*Addington* v. *Texas* (1979) 441 U.S. 418, 423 [60 L.Ed.2d 323, 329, 99 S.Ct. 1804]; see generally *In re Winship, supra,* 397 U.S. 358, 370 [25 L.Ed.2d 368, 379], Harlan, J., conc.)

■ Plainly, it cannot be said of society's interest in preventing an erroneous determination of the lack of a conservatee's power to consent that it is "no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor" in a civil suit for money damages. (*In re Winship, supra,* 397 U.S. 358, 371 [25 L.Ed.2d 368, 379], Harlan, J., conc.) At the same time, the criminal sanction of incarceration is not, strictly speaking, at issue here. (Cf. *Conservatorship of Roulet, supra,* 23 Cal.3d 219.)

The state has, of course, a profound interest in insuring appropriate treatment for the conservatee as well as access to such treatment even for those who by virtue of their illness are incapable of understanding the benefit of the treatment and giving consent to it. It has an equal interest in insuring that such a serious and intrusive procedure is not forced on a conservatee who does not want it and who is simply in disagreement with his conservator and his physicians. "The proof beyond a reasonable doubt standard is inappropriate in a . . . proceeding where the state may be an adversary to the [patient] but also may be a necessary champion" for his right to treatment. (*In re Angelia P., supra,* 28 Cal.3d 908, 919.) The clear and convincing evidence test is consistent with the balancing of these interests and the proper allocation of the risk of error. Indeed, as the conservator notes, "to use the much more difficult standard of beyond a reasonable doubt in such a hearing would frustrate the purpose of the LPS Act and effectively condemn a gravely disabled person to life in a mental institution."

Real party's initial opposition argued that any standard of proof greater than that of a preponderance of the evidence would create "confusion" and "chaos" in trial courts regarding standards of proof to be used for various medical treatments for conservatees. Decisional law does not support this view. We note, for example, that in *Maxon* v. *Superior Court* (1982) 135 Cal.App.3d 626, 633-634 [185 Cal.Rptr. 516], a clear and convincing evidence requirement was posited concerning the necessity of a hysterectomy for a conservatee because of the impact of that procedure upon the conservatee's right of privacy.[5]

---

[5]We note that real party has retreated from this position in the return to the alternative writ, and indeed relies upon *Maxon, supra,* 135 Cal.App.3d 626, in arguing that the standard of proof on the question of consent is certainly not one of proof beyond a reasonable doubt.

Our research has disclosed no cases expressly deciding the point at issue. While *New York Health & Hosp. Corp.* v. *Stein* (1972) 70 Misc.2d 944 [335 N.Y.S.2d 461] discusses the sufficiency of a particular record on a conservatee's capacity to consent to ECT, the court, in determining that the conservatee was capable of knowingly refusing the treatment, did not expressly state which standard of proof it applied. We do not join in real party's view that the opinion "quite obviously" did not use a beyond a reasonable doubt standard and as "almost assuredly" applying a preponderance standard.[6] Other instructive appellate decisions are *Maxon, supra*; *Grannum* v. *Berard* (1967) 70 Wn.2d 304 [422 P.2d 812, 25 A.L.R.3d 1434][7] and *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 246 [104 Cal.Rptr. 505, 502 P.2d 1].[8]

We need not and do not decide here which standard of proof might be required to determine capacity to consent to other forms of more or less intrusive medical procedures. We merely conclude that clear and convincing evidence must be presented to support an order that a conservatee lacks the capacity to consent to or refuse ECT.

Let a peremptory writ issue commanding respondent superior court to set aside its order of March 16, 1984, in LPS No. 25692, determining that conservatee Lillian F. did not have the capacity to give written, informed

---

[6]In *Stein,* the patient, had been declared mentally ill after a court hearing and was ordered retained for care and treatment. Thus, by virtue of that order, the hospital was authorized to carry out *whatever* treatment was deemed appropriate. (*Stein, supra,* 70 Misc.2d 944.) The hospital, however, "commendably" chose to proceed under changes not yet in effect and applied for a court order authorizing ECT, despite the fact that the patient steadfastly objected to it. Specifically, the court addressed the question of whether the patient had the mental capacity to give consent. Stein [the patient] was examined by "independent psychiatrists" who testified not only that she was capable of consenting or withholding consent, but also that ECT was not clinically indicated in her case. (*Id.,* at p. 946.) In "sharp dispute" was the testimony of other doctors produced by the hospital who testified that the treatment was the one of choice for Stein and that she " 'is not now nor was she during any period of her hospitalization able to make a rational judgment about any treatment she might require.' " (*Ibid.*) In addition, the court made its own observations of the patient and conversed with her in open court. (*Id.,* at pp. 946-947.) The court noted that because the "greatest suffering from an incorrect decision will be borne by respondent herself, [it] must permit her refusal to be determinative unless the evidence is sufficient to *convince* the court that she lacks the mental capacity . . . ." (*Id.,* italics added.)

[7]"Clear, cogent and convincing evidence" was required in a battery suit to overcome the presumption that every man is sane; where the plaintiff's theory was of lacked capacity to consent to a septal reconstruction corrective surgery procedure.

[8]A patient's consent was deemed not vitiated in a malpractice suit alleging a doctor's failure to disclose inherent risks of surgery. "[D]isclosure need not be made beyond that required within the medical community when a doctor can prove by a preponderance of the evidence he relied upon facts which would demonstrate to a reasonable man the disclosure would have so seriously upset the patient that the patient would not have been able to dispassionately weigh the risks of refusing to undergo the recommended treatment." (*Id.,* at p. 246.)

consent to convulsive treatment. The stay heretofore imposed shall remain in effect until the finality of this decision.

Racanelli, P. J., and Holmdahl, J., concurred.