125 F.3d 857
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Joseph ALOISIO, Plaintiff-Appellee,
v.
Richard McClure HODGES, Defendant-Appellant.
 No. 96-16474.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 18, 1997. San Francisco, California
Decided Oct. 2, 1997.
 
 Appeal from the United States District Court for the Northern District of California Edward A. Infante, Magistrate Judge, Presiding
 Before ALDISERT**, THOMPSON and CHOY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Richard Hodges appeals from a judgment against him entered on a jury verdict that found Hodges had conspired with his wife, Deborah Knotts Hodges, to defraud Joseph Aloisio. Hodges argues that: (1) a subsequent decision of the bankruptcy court precludes the prior findings of the district court; (2) the evidence did not support a finding of conspiracy to defraud; (3) the district court erred in refusing to instruct the jury on California's "heart-balm" statute; and (4) the evidence did not support the award of punitive damages.
 
 
 3
 Aloisio met Deborah Knotts in 1981 when both worked for IBM in San Jose, California, and he soon developed strong feelings for her. Knotts moved out of state in November 1981, but she kept in touch with Aloisio. After Knotts moved, she saw Aloisio only once, but they spoke by telephone for "hundreds of minutes every month." Knotts periodically sent Aloisio small gifts, as well as notes and cards expressing her friendship and love for him.
 
 
 4
 In July 1981, Aloisio began lending money to Knotts, a practice that escalated into extraordinary amounts of money. By 1994 he had advanced her approximately $450,000. Aloisio continued to lend her money for various purposes, such as basic living expenses, insurance and medical bills. Aloisio learned later that Knotts lied to him about her financial needs. For example, Knotts told Aloisio that she needed breast implants for medical reasons, and then asked for money to replace the implants because they were leaking. In fact, Knotts never had implants but instead used Aloisio's money to pay for her son's college tuition and for various personal expenses, such as clothing from department stores, massage therapy and manicures.
 
 
 5
 Knotts promised to repay Aloisio on several occasions. She offered to sign a promissory note, but Aloisio refused. Knotts promised to repay him by working. Knotts was also a plaintiff in two lawsuits involving auto accidents, and she promised to repay Aloisio with the proceeds from the suits. Knotts lost at trial in the first suit and received $40,000 in the second but did not repay Aloisio. Knotts falsely represented to Aloisio that she was involved in a third law suit over faulty breast implants.
 
 
 6
 Knotts and Aloisio occasionally discussed marriage (even though he gave the first loan to her for the purpose of her going to Montana to marry another man) and Aloisio told Knotts she would not have to repay him if they married. In 1988, Knotts began living with Appellant Hodges. Aloisio knew that Knotts and Hodges were living together in 1988 and 1989. In May 1989, however, unbeknownst to Aloisio Appellant Hodges and Knotts moved into a house that Hodges purchased. Aloisio did not know Knotts had moved because she received her mail at a post office box and because the new home had a separate phone line with the same number Knotts previously had at her apartment.
 
 
 7
 Hodges was present when Knotts in a deposition testified that Aloisio was giving her money. Hodges asked Knotts about the money and she said Aloisio gave her only a "few thousand dollars." Hodges testified that he asked Knotts to stop taking money from Aloisio and that, because Knotts deposited the money into her separate bank account, he was unaware that Knotts continued to receive money from Aloisio after the deposition.
 
 
 8
 Knotts married Hodges in 1991 and changed her last name to Hodges. Aloisio was unaware of the marriage, and he continued to speak with Knotts regularly. He testified that Hodges answered "Knotts residence" whenever he picked up the separate phone line with the number from Knotts' old apartment
 
 
 9
 In late 1994, Hodges and Knotts moved to Texas. Shortly thereafter, Aloisio learned that Knotts had been married and that she had lied to him about her various medical expenses. Aloisio testified that he might have continued to lend money to Knotts even though she was married, but he stopped giving her money because he found out that she lied to him. Aloisio sent Knotts a letter demanding repayment of the loans.
 
 
 10
 On March 24, 1995, Aloisio filed a complaint against Knotts and Hodges stating various causes of action including breach of contract, money had and received, fraud and conspiracy to defraud. On May 2, 1996, Knotts filed for bankruptcy, thus staying the proceedings against her. The trial proceeded against Hodges and the jury found for Aloisio. The jury rejected his cause of action for breach of contract and concluded that Hodges did not act as Knotts' agent, but found for Aloisio on his claims for money lent, money had and received, and conspiracy to defraud. On the conspiracy count, the jury awarded $249,430, which represented the amount Aloisio lent to Knotts after she began living with Hodges. The jury also awarded punitive damages in the amount of $111,315. The district court denied Hodges' motions for a new trial and for judgment as a matter of law. On appeal, Hodges challenges these rulings, but only as they relate to the conspiracy claim and the award of punitive damages.
 
 
 11
 After the district court entered its judgment, Knotts' bankruptcy proceeding continued. Aloisio initiated an adversary proceeding against Knotts in the bankruptcy court and the court awarded him $249,430 plus interest on his claim that Knotts willfully and maliciously injured him. The court denied Aloisio relief on his alternate theory that Knotts committed fraud; the court determined that Aloisio did not justifiably rely on any misrepresentations made after 1991. Hodges now argues that the bankruptcy court's findings are binding on this case.
 
 II
 
 12
 Hodges first argues that a subsequent finding by the bankruptcy court precludes the prior findings of the district court in this case. The bankruptcy court determined that Aloisio's reliance on Knotts' misrepresentations was not justified after 1991, a determination that conflicts with the district court's earlier findings on the conspiracy claim. Hodges argues that under the doctrine of issue preclusion we should reverse the district court's award of damages for the loans Aloisio made after 1991.
 
 
 13
 "The doctrine of collateral estoppel bars the relitigation of issues that were resolved in a prior proceeding ..." Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1399 (9th Cir.1992) (emphasis added). Hodges' argument turns this rule on its head. He argues that this court must reverse the judgment of the district court because an issue was resolved differently in a subsequent proceeding. He cites no support for this position and our research indicates that none is available. See 18 Moore's Federal Practice § 132 (Matthew Bender 3d ed.1997) (collecting cases, all of which require that issue was resolved in prior litigation).
 
 II.
 
 14
 California recognizes the common law tort of civil conspiracy, which has three elements: (1) the formation of a conspiracy; (2) wrongful conduct in furtherance of the conspiracy; and (3) damage. Duncan v. Stuetzle, 76 F.3d 1480, 1490 (9th Cir.1996). Hodges argues that Aloisio failed to establish elements (1) and (2). We disagree.
 
 
 15
 The formation of a conspiracy requires that each conspirator (1) have actual knowledge of the intended tort, and (2) intend and agree to aid in the wrongdoing. Kidron v. Movie Acquisition Corp., 40 Cal.App. 4th 1571, 47 Cal.Rptr.2d 752 (1995). A conspiracy may be inferred from the actions of the parties and the surrounding circumstances. Chicago Title Ins. Co. v. Great W. Fin. Corp., 69 Cal.2d 305, 316, 444 P.2d 481 (1968).
 
 
 16
 Hodges argues that the evidence was insufficient to prove he knew about Knotts' plan to commit fraud, or that he agreed to aid in that plan. He contended at trial that he knew nothing about the money Knotts was receiving from Aloisio, except for the "few thousand dollars" that Knotts mentioned in her 1989 deposition.
 
 
 17
 The jury could have found Hodges' testimony not credible, and it could have reasonably inferred that Hodges knew about the fraud because Knotts received such a large amount--$249,430--after she began her relationship with Hodges. The evidence showed that Hodges maintained a separate phone line in his home with Knotts' old telephone number, and that according to Aloisio, Hodges answered this line "Knotts residence," even though Knotts changed her name to Hodges when she married. This evidence was called into question by one of Hodges' witnesses, who testified that Hodges' telephone voice was indistinguishable from that of Knotts' son, suggesting that it was not Hodges but the son who answered when Aloisio called. ER 230-231 (testimony of Virginia Delaney). As finder of fact, however, the jury could have determined that Aloisio's testimony was more credible than Delaney's.
 
 
 18
 Although there was only a small amount of evidence indicating that Hodges knew about and agreed to aid in Knotts' plan to defraud Aloisio, the quantum of evidence was sufficient for the jury to reasonably find that Hodges conspired with Knotts.
 
 
 19
 Hodges argues that Aloisio failed to establish a conspiracy to defraud because he failed to show that either Hodges or Knotts committed any actual fraud. Fraud contains five elements: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) damage. Molko v. Holy Spirit Ass'n, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122, 762 P.2d 46 (1988). Hodges argues that Aloisio failed to prove justifiable reliance.
 
 
 20
 The evidence is to the contrary. Aloisio relied on Knotts' false promises to repay him (from lawsuits and her work activity), her false claims that medical problems required her to borrow money and precluded her from working, and her concealment of her marriage. Hodges did not produce any substantial evidence to demonstrate that Aloisio knew or should have known that Knotts was lying. Because the jury could have reasonably concluded that Aloisio justifiably relied on Knotts' misrepresentations, the court did not err in denying Hodges' motions for a new trial and for judgment as a matter of law.
 
 III.
 
 21
 California's "heart-balm" statute provides: "A fraudulent promise to marry or to cohabit after marriage does not give rise to a cause of action for damages." Cal. Civ.Code § 43.4. The statute embodies "a basic reluctance on the part of both the Legislature and the judiciary to allow recovery for promises of love." Askew v. Askew, 22 Cal.App. 4th 942, 953, 956, 28 Cal.Rptr.2d 284 (1994) (explaining history of statute).
 
 
 22
 Hodges proffered the following jury instruction:
 
 
 23
 A fraudulent promise to marry, or to cohabitate after marriage, does not give rise to a cause of action for damages.
 
 
 24
 If you find that plaintiff would have forgiven the indebtedness he claims from Deborah Hodges if she married him, you must find the alleged debt to be unenforceable.
 
 
 25
 ER 242. The court rejected this instruction on the grounds that "there was not sufficient evidence upon which a jury could find your asserted affirmative defense." Hodges now argues that the court erred in failing to instruct the jury that California law prevents lawsuits over wrongs to the heart. We are satisfied that the district court correctly concluded that there was no evidence of a promise to marry in this case.
 
 
 26
 Aloisio's claim was premised on numerous misrepresentations that would not be covered even by the most expansive reading of the heart-balm statute. Although Aloisio did introduce evidence that Knotts sent cards expressing her love for him, Aloisio did not base his fraud claim on the truth or falsity of the statements in these cards. He based his claim on Knotts' false promises to repay him (from lawsuits and work), her false claims that medical problems required her to borrow money and precluded her from working, and her concealment of her marriage to Hodges.
 
 IV.
 
 27
 California law provides for exemplary damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ.Code § 3294(a). "The clear and convincing standard requires that the evidence be so clear as to leave no substantial doubt in the mind of the trier of fact; it must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " Tannehill v. Finch, 188 Cal.App.3d 224, 228, 232 Cal.Rptr. 749 (1986) (citing Lillian F. v. Superior Court, 160 Cal.App.3d 314, 320, 206 Cal.Rptr. 603 (1984)).
 
 
 28
 Although we have concluded that Aloisio mounted his hurdle of proving by a preponderance of the evidence that Hodges participated in a conspiracy, thus entitling Aloisio to compensatory damages, the question of whether his evidence met the clear and convincing standard to entitle him to punitive damages presents a closer issue.
 
 
 29
 Aloisio introduced circumstantial evidence to show that Hodges knew about Knotts' plan to defraud and that he agreed to aid her in that plan. The evidence showed that (1) Hodges knew that Knotts received money from Aloisio in the past; (2) Knotts received such a large amount of money that the jury could infer Hodges must have known about it; and (3) Hodges had a separate telephone line in his home with the same number as Knotts' old apartment and Hodges answered this number "Knotts residence."
 
 
 30
 The court submitted the case to the jury with an instruction on the issue of punitive damages: "Now, in addition to compensatory damages, there is the topic of punitive damages ... You may in your discretion award such damages if but only if you find by clear and convincing evidence that Mr. Hodges was guilty of oppression, or fraud or malice in the conduct on which you base your finding of liability." CR Vol. 5 at 689-690. Hodges did not object to this instruction. CR Vol. 4 at 571. After the jury entered its verdict, Hodges renewed his motion for judgment as a matter of law. He argued that the award of punitive damages must have been the result of passion and prejudice, because the jury deliberated for less than an hour. Hodge's July 1, 1996 Memo at 11.
 
 
 31
 We are satisfied that although the evidence was only circumstantial, the jury was instructed, with no objection, that it could find punitive damages if there was proof of one of three conditions--oppression, fraud or malice. Having determined that Hodges was liable under a theory of conspiracy to defraud, the jury was empowered to return a verdict of punitive damages if the jury believed that fraud was proven by clear and convincing evidence. On this record we will not conclude that evidence did not rise to the clear and convincing evidence standard.
 
 
 32
 We have considered all arguments advanced by the parties and have concluded that no further discussion is necessary. AFFIRMED.
 
 
 
 **
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts in this circuit except as provided by Ninth Circuit Rule 36-3