[Nos. G014021, G014610, G014892. Fourth Dist., Div. Three. Feb. 17, 1994.]

RONALD L. ASKEW, Plaintiff and Respondent, v.
BONNETTE M. ASKEW, Defendant and Appellant.

## COUNSEL

Millar, Hodges, Bemis & Mozingo, Richard W. Millar, Jr., David A. St. Clair and Susan D. Porter for Defendant and Appellant.

Steven C. Smith and Albert M. Graham, Jr., for Plaintiff and Respondent.

## OPINION

### SILLS, P. J.—

#### I. INTRODUCTION

Queen Victoria's reign still had more than 30 years to go when, in 1868, Attorney William Gilbert sketched his operetta Trial by Jury which lampooned lawsuits for breach of promise of marriage.[1] In Gilbert's story, the defendant was a cad—who loved one young lady today—and another young

---

[1] See Jefferson, The Complete Gilbert & Sullivan Opera Guide (1984) at page 39 (hereinafter Jefferson).

lady tomorrow. The plaintiff, as one might guess, was one of yesterday's young ladies. But while she may have been brokenhearted, she was not so despairing as to ignore the opportunity to profit on her distress. "Blessing—what love and caressing" rhymed with "assessing"—as in damages—in her plea for a large jury award against the monster defendant.[2] And even though she told the jury how madly she worshipped and adored her erstwhile suitor, she did not hesitate to run off with the judge at the end.

If there was a serious "legal" point behind Gilbert's satire of breach of promise cases, it was the potential for abuse inherent in such lawsuits, which, when Gilbert was writing, could still result in the redistribution of a large part of a defendant's wealth as the result of the breakup of a "relationship" (to use the modern term). This potential was to be well noted by the 1930's in more prosaic legal literature discussing breach of promise suits,[3] and in 1939 the California Legislature, following the lead of several other states,[4] decided to put an end to such causes of action.[5]

The present case, like Gilbert's Trial by Jury, also involves a breach of promise suit. The plaintiff, of course, does not call it that. For him, this is a case of fraud: before he married the defendant, his bride-to-be told him she felt sexual attraction for him, and in reliance on that statement he married her and put certain parcels of real property (which he claims are his separate property) into both their names as joint tenants. Thirteen years and two children after his marriage to the defendant he sued her, claiming she "never" felt sexual attraction for him and her "fraud" justified imposing a trust on her share of certain property taken in joint tenancy.

Under certain circumstances spouses can sue each other for torts after marriage (*In re Marriage of McNeill* (1984) 160 Cal.App.3d 548 [206 Cal.Rptr. 641], disapproved on another point in *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451, fn. 13 [224 Cal.Rptr. 333, 715 P.2d 253]). The

---

[2]See Jefferson, *supra*, at pages 43-48; in particular see page 47: "Monster, monster, dread our fury—There's the Judge, and we're the Jury!"

[3]See Survey, *The Work of the 1939 Legislature* (1939) 13 So.Cal.L.Rev. 1, 37 ("The actions for breach of promise to marry, seduction and alienation of affections have long been the target of criticism. It has been urged, with much vigor: that they were more the weapons of a blackmailer than the shield of an appealing victim; that they were anomalous attempts to protect, by law, duties and obligations unsuited to litagious [*sic*] procedures; and that, as they had developed, they permitted recoveries of damages out of all proportion to the real injuries involved.").

[4]*The Work of the 1939 Legislature, supra*, at page 37, footnote 3. The other jurisdictions included Indiana, Illinois, Michigan, New Jersey, New York and Pennsylvania.

[5]In 1939, the Legislature added new section 43.5 to the California Civil Code, which stated: "No cause of action arises for : . . . [¶] (d) Breach of promise of marriage." (See Stats. 1939, ch. 128, § 2, p. 1245.)

allegations here, however, involved representations that were for the most part made before the marriage and, in any event, constituted statements of love and sexual desire which are not legally cognizable, whether made before or after marriage. The California anti-heart-balm statutes which long ago did away with breach of promise actions establish a public policy against litigation of the affairs of the heart. This case may be gussied up as a fraud action, but it is still essentially a breach of promise suit.

## II. FACTS AND LEGAL HISTORY

Ronald and Bonnette Askew married on December 9, 1977. They had two children, a girl born in 1979 and a boy born in 1982, and in May 1991, Bonnette[6] filed for dissolution. Ronald filed his response by July 5. In October 1991, five months after the dissolution action was filed, Ronald filed a separate civil lawsuit for fraud and spin-off causes of action.[7]

The complaint was expressly predicated on five premarital "representations" made in the summer and fall of 1977 by Bonnette to Ronald:

—She "loved, desired, and cared for" him, and wanted to marry him "solely because of the affection and desire she had for him."

—She loved his minor children (from a prior marriage) and "would watch over, care, assist in the rearing, and provide financially for" them in the event he could not provide for them.

—She would hold any separate property he transferred to her for the benefit of his minor children.

—She answered "nothing," when asked "if there was anything he should know before they got married."

---

[6]While there is something to be said for referring to the parties by their generic roles of "husband" and "wife," Justice King's observation in *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475-476, footnote 1 [274 Cal.Rptr. 911] seems the better rule under the facts of this case: "Referring to the parties by their first names personalizes the opinion for the parties and, for other readers, makes the opinion easier to understand. . . . [T]he parties in marital dissolution actions are human beings and we use their first names, in part, to humanize a decision resolving personal legal issues which seriously affect their lives."

[7]The complaint listed eight causes of action in all: fraud, negligent misrepresentation, breach of fiduciary duty, constructive trust, constructive fraud, accounting, cancellation of deeds, and intentional infliction of emotional distress. The last cause of action included as a defendant one Thomas Coffey, who was alleged to have engaged in a meretricious relationship with Bonnette while Ronald and Bonnette were still living together. Ronald sued on the theory that, after disclosure of the affair, for a period of time he was fearful of having contracted a venereal disease. Coffey was dismissed after his demurrer was sustained without leave to amend and this court affirmed the judgment of dismissal in an unpublished opinion. (*Askew* v. *Coffey* (Apr. 8, 1993) G012378.)

—Her "actions prior to the marriage" (the complaint did not specify what actions) "were performed to show" that she did, in fact "physically desire and have passion" and, further, were indeed "performed for the purpose of inducing" him to marry her.[8]

The complaint also alleged one *postmarital* representation: that Bonnette would hold "the property" (meaning, from the context, any of Ronald's separate property to which she was put on title) "for his benefit and that of his children."

The complaint then listed a total of 10 properties which, it claimed, had been purchased with Ronald's separate funds; title to these properties, however, had been put in joint tenancy because of Bonnette's representations. (Nine of the ten properties had been acquired after the marriage.)

Bonnette demurred to the civil suit and sought its consolidation with the dissolution action. Both motions were denied.[9] The parties then agreed that all property issues in the dissolution action, "both separate and community," should be continued until after the civil action.

The issues of custody, support and attorney fees in the dissolution action went to trial in November 1992. The family law court awarded Bonnette $15,000 in attorney fees toward the dissolution case only, and indicated she would need to bring a special motion for attorney fees toward the civil action.[10]

Bonnette filed such a motion in January 1993, which was heard in February 1993, about six weeks before the civil action would be called for

---

[8]Paragraph seven of the original complaint set out the five representations in subparagraphs A through E. Hence this last "representation" is taken from subparagraph E. The literal language of paragraph seven is that prior to the marriage Bonnette made representations *about* the reasons for her "actions prior to marriage." And, taken literally, this language does not make a great deal of sense. Not even lawyers talk that way in real life. ("Dear, I have performed actions prior to our forthcoming marriage for the purpose of showing you that I physically desire and have passion for you and to induce you into marrying me.") We therefore suspect that the complaint really meant subparagraph E to be a kind of wrap-up statement summarizing, from the complaint's point of view, the general reason for Bonnette's undisclosed "actions."

[9]Except the demurrer was sustained for the last cause of action for intentional infliction of emotional distress against Thomas Coffey, Bonnette's alleged paramour. See footnote 7, *ante.*

[10]Authority for such a motion may be found in Family Code section 2030, subdivision (a) (formerly Civ. Code, § 4370, subd. (a)): "[T]he court may augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution or defense of the proceeding *or any proceeding related thereto* . . . ." (Italics added.) See also *In re Marriage of Green* (1992) 6 Cal.App.4th 584, 589-592 [7 Cal.Rptr.2d 872] (trial court had jurisdiction to award wife attorney fees incurred in separate civil actions).

trial. The family law court denied the motion. It reasoned that consolidation was a "condition precedent" to a fee award, and the cases were not consolidated. Bonnette soon filed a notice of appeal from the order.

Trial commenced in the civil action in late March 1993. At that point Ronald dropped his claims with regard to five of the ten pieces of property listed in the complaint.

After a few preliminaries, the opening statement on Ronald's behalf began by recounting something Bonnette had said at a counseling session in 1991, just prior to the commencement of dissolution: "Ron, I have not been fair to you in this marriage. I haven't loved you. I haven't been honest with you. I feel like I have cheated you." Ronald's counsel then went on to emphasize that the remaining five pieces had been acquired with Ronald's separate property[11] as part of an "investment plan" intended to benefit Ronald's two children. Counsel then referred to Bonnette's lack of passion and sexual attraction for Ronald at the inception of the marriage, and how Ronald would never have married her or put any of his property in her name if he had known of it.[12] After the opening statement Bonnette made a motion for nonsuit, which was denied.

Ronald testified there were "numerous discussions" with Bonnette about "passion, desire or physical attraction" before their marriage. Bonnette said (in Ronald's words) "that she loved me. That she had this lust, this passion, this desire. That I could trust her. That I could believe in her." Later he testified that Bonnette "described the passion as being this—this—this—this—love. This—this sexual desire. This—this strong commitment. This great endorsement for me as a person." She also said, "I am honest with you. I will always be honest with you. You can trust me. You can believe in me. I will not lie to you." Many times Ronald asked her to tell him "if there's anything I should know about our marriage, or anything about our relationship, be honest with me. Tell me. Tell me before the marriage." Bonnette said there was "nothing" Ronald "need[ed] to know."

---

[11]The theory was that after the marriage Ronald was paid "bonuses" for work that he did prior to the marriage. Ronald then used these bonuses to acquire the properties, which, because the properties generated a positive cash flow, became self-sustaining.

[12]From the transcript: "You are going to hear depositions, Bonnie's depositions, basically, go to the fact that she's going to say prior to marrying Ron Askew, prior to marrying him, I knew I had no passion, no desire, physical or sexual for Ron Askew. I had no desire for the man. . . . [¶] Ron Askew is going to say, 'I wouldn't have married her. I wouldn't have married her. But I wouldn't have put my property in her name. For heaven's sake, I could have held my property by myself.' "

Ronald then testified he relied on these statements in transferring the five properties "into her name."[13] (Four of the five properties were acquired after the marriage.) But he would not have transferred the properties if he had "known the truth" (referring to the revelations from the 1991 counseling session) that he knew "now"—i.e., that she really had no desire for him "physically" or "sexually," that she had no "passion" for him prior to the marriage, or "during" the marriage.

Ronald also testified that on a number of occasions both prior to and just after the marriage he spoke with Bonnette about a particular property on Pine Street (the one property among the 10 listed in the complaint that was acquired before the marriage). The pair talked about transferring title "from [Ronald's] name" into their "joint names," and Bonnette "would hold this in trust, that in the event that something should happen to [Ronald], that this property, this Pine Street property, would be used for the benefit of my children [from the previous marriage], as well as, my mother."

Bonnette was called as part of Ronald's case-in-chief. She admitted that she did not have sexual desire for Ronald prior to or during the marriage, even though she "may," at one point "early on in the relationship," have told Ronald that the two of them had a "very satisfying" sexual relationship. Ronald also called a friend of the Askews who testified that in about 1989 while at dinner at a local restaurant Bonnette told her that she did not love Ronald when they first got married.

Ronald's son from the previous marriage testified about three discussions where both Ronald and Bonnette were present concerning financial arrangements for his education. At one discussion, Ronald had said "things [had] been provided" for his education, and Bonnette had said, "not to worry." More particularly, Ronald had said he "had attained [sic] property that would be used for the benefit of" Ronald's two children. Bonnette said "the property would be used for [the son's] education" and "we'll always be there for you." Regarding a second discussion the son testified that both Ronald and Bonnette told him "that the assets that my father acquired would be used for furthering of my education."[14] The exact assets were not specified. The third conversation concerned the son's plans to do graduate work and pursue

---

[13]The words "into her name" convey the impression that Ronald conveyed all his interest in the properties to Bonnette. The impression is, however, imprecise. With the exception of the Pine Street property (owned prior to marriage) that Ronald conveyed from sole ownership into joint tenancy, Ronald did not "transfer" any real property to Bonnette *directly*. Rather, he simply *arranged* for title on the properties acquired after marriage to be taken in joint tenancy.

[14]The idea that both Ronald and Bonnette said this is an inference favoring Ronald that we extract from the testimony. The answer came in response to this (unobjected to, but compound) question: "And do you recall what was said by your father and Bonnie? Were either

an MBA, and again it was mentioned (the testimony is not clear precisely who was talking) that "my father had acquired property that would be used for the benefit of my education."

Ronald also called the family accountant to testify about two discussions prior to the marriage when he was present with Ronald and Bonnette and Ronald's assets were discussed. (These were social outings at restaurants.) At the first, the general discussion was that Ronald would invest in real estate, and accumulate "some kind of an estate" for his two children from his previous marriage. At the second, Ronald again outlined a plan "to invest in real property, make investments for his children and accumulate an estate." The accountant, however, said he did not remember anything specific about Bonnette holding title to any of the property. Nor did the accountant remember any "specific meetings" after the marriage where Ronald's property was discussed. He further testified that Bonnette was not present, after marriage, when he and Ronald met to discuss Ronald's business matters, though when he and Ronald did meet, Ronald would refer to certain of the properties as his own, and mentioned that his purpose in acquiring them was "primarily for the benefit of his two older children."

At the close of Ronald's case, Bonnette moved for a nonsuit or directed verdict. The motions were denied. The case went to the jury, who were told that Ronald could prove fraud by showing that Bonnette made "a" false representation as to "a past or existing material fact" for the purpose of inducing Ronald to rely upon that representation. Alternatively, they were told that Ronald could prove fraud by showing that Bonnette, with intent to defraud Ronald, had intentionally concealed or suppressed "a" material fact which she was under a duty to disclose to Ronald. The jury was given a special verdict form which began with the question as to whether Bonnette made "a representation as to a past or existing material fact." Nowhere in the special verdict form was the jury required to specify the nature of the false representation upon which it might be returning a fraud verdict.

The jury found that Bonnette had indeed made "a" false representation as to "a" past or existing material fact, and concluded that the total amount of damage suffered by Ronald in reliance on the truth of that "representation" (again, the nature of which was nowhere to be found in the form) was $1,000. It further found that Bonnette had concealed "a material fact" and awarded Ronald $1,009.50 as damages suffered by the concealment of that fact. The jury next found that Bonnette owed a "duty of trust and confidence" to Ronald "to hold the property for the plaintiff and his children."

of them in that discussion?" However, the inference was undercut three questions later, with "What did Bonnie say in the discussion?"—a question that implied it was Ronald who was doing the talking.

They determined she breached that duty "by failing to convey the property upon request" and awarded Ronald $240,000 as damages "caused by the breach." Finally, the jury determined that Ronald had been damaged in the amount of $84,693 "with respect to the Pine property."

The trial court subsequently signed a judgment which recited, among other things, that "By reason of said special verdict Ronald L. Askew, plaintiff, is entitled to judgment against defendant, Bonnette M. Askew, in the amount of $242,009.50."[15] The judgment then decreed that "resulting and constructive" trusts shall be imposed upon any interest of Bonnette's in the four of the five properties that had been acquired after the marriage.[16] The judgment ordered Bonnette "forthwith to convey" any interest she had in those properties to Ronald, and if she failed, provided that the court clerk would do it for her. The judgment further provided that the deeds to the properties (which were attached to the judgment) were reformed to "provide that the grantee of all of the said real property . . . is Ronald L. Askew, a single man, as his sole and separate property."

Bonnette then filed motions for new trial, judgment notwithstanding the verdict, and vacation of judgment, all of which were denied. She also brought a motion to tax certain costs (over $10,000 in expert witness fees pursuant to section 998 of the Code of Civil Procedure) awarded Ronald. Bonnette timely filed notices of appeal from both the judgment in the civil action and the order denying her motion to tax costs. This court subsequently consolidated these two appeals with the earlier appeal from the order denying attorney fees in the dissolution action.

### III. DISCUSSION

#### A. *Sex, Lies and Trust Agreements: the "Breach of Promise" Case*

■ We have reviewed the record in some detail to demonstrate that the foundation of Ronald's civil case against Bonnette cannot fairly be characterized as some mundane bit of estate planning based on avoiding probate by holding property in joint tenancy. On appeal Ronald has sought to retrofit his case by downplaying the degree to which his recovery was based on

---

[15]According to Ronald's brief on appeal, the court heard the equitable causes of action after the jury returned its verdict, and the judgment ultimately signed by the trial court was only an equitable one. However, that judgment plainly declares that by reason of the jury's special verdict Ronald is "entitled to judgment . . . in the amount of $242,009.50."

[16]We assume that, notwithstanding the "entitlement" language in the judgment referred to in the previous footnote, Ronald would interpret the judgment as merely requiring the conveyance of the properties, which would be the substantive equivalent of a money judgment for about $242,000.

Bonnette's false statements of love and sexual desire. As his counsel framed the matter at oral argument, those statements merely made his reliance on Bonnette's alleged agreement to hold certain property in trust for him and his children "reasonable."

However, the record simply will not support this post hoc recasting of the basic theory of the case. From Ronald's complaint to his counsel's closing argument before the jury, Bonnette's "misrepresentation" about her love and sexual attraction for him was the very essence of Ronald's case—*had she not misrepresented her feelings concerning love and sexual desire he would never have married her and put property into joint tenancy*. The idea is plain from the language of the complaint, formed a significant part of Ronald's own testimony, and played the major role in his counsel's closing argument to the jury.[17] Moreover, Ronald's theory of the case was sufficiently clear to Bonnette that much of her defense was predicated on showing that her feelings toward Ronald were a great deal more complex than simply never having any sexual desire for him. Finally, the special verdict form and jury instructions concerning the fraud cause of action were obviously crafted to allow the jury to find fraud if Bonnette made "a" misrepresentation of *any* nature to Ronald, including a misrepresentation of her love and sexual desire.

We therefore decline Ronald's invitation to limit our analysis strictly to those statements which arguably support the notion that the couple had an oral trust arrangement for Ronald's separate property, independent of any statement of love, sex or passion. Indeed, we do not reach the issue of whether even that limited evidence supports the existence of such an arrangement. As explained below, whether Bonnette ever agreed to hold, as a joint tenant, Ronald's separate property in trust—what family law practitioners sometimes call a "Lucas agreement"[18]—is a matter for the family law court to determine on remand. For our purposes on appeal it is clear that Ronald has sued for false statements of love and sexual desire on which he relied in getting married and in arranging property acquired during the marriage to be taken in joint tenancy. The substance of Ronald's case as actually pled and presented was thus nothing more than the latter-day incarnation of a breach of promise suit.

---

[17]As counsel told the jury, "we have talked a lot in this trial about sexual desire about physical desire." Indeed, counsel began his closing argument by discussing how the couple talked prior to their marriage of their romantic attraction for each other and denigrating Bonnette's and her therapist's credibility in light of her subsequent statements. Counsel emphasized Ronald's crestfallen reaction upon hearing that his wife had never had sexual desire for him, and pointed out that Ronald had testified that he would never have married Bonnette if he had known of the true state of her emotions. Counsel completed almost three-quarters of his closing argument before raising the subject of trust agreements.

[18]After *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285].

Writing in 1868, Attorney Gilbert was ahead of his time in criticizing such suits. Criticism of breach of promise actions did not reach its peak until the period between the beginning of the century and the second world war[19] as part of a growing distaste in the legal community for "heart balm"[20] lawsuits. Before the California Legislature abolished the cause of action in the late 1930's, there was considerable academic criticism concentrated specifically on the breach of promise action, which was commonly perceived as a "tool[ ] for blackmail"[21] and a means for extortion.[22]

California's anti-heart-balm statute reads the same today as it did in 1939: "No cause of action arises for: [¶] (a) Alienation of affection. [¶] (b) Criminal Conversation. [¶] (c) Seduction of a person over the age of legal consent. [¶] (d) Breach of promise of marriage." (Civ. Code, § 43.5.)

After enactment, however, the outer perimeters of the statute remained to be mapped out by the courts. ■ The statute obviously prohibited (and still prohibits) lawsuits seeking contract damages for the emotional pain of a broken engagement, but whether it also prohibited tort lawsuits based on fraudulent or deceitful promises to marry. or live as a married couple was unclear. The case of *Langley* v. *Schumacker* (1956) 46 Cal.2d 601 [297 P.2d 977], and the Legislature's response to it, demonstrates that the tort labels of fraud and deceit are by themselves irrelevant. Courts must look to the *substance* of the lawsuit.

---

[19]Note, *Heartbalm Statutes and Deceit Actions* (1985) 83 Mich. L.Rev. 1770, 1773-1774, footnote 15 (hereinafter Heartbalm Note).

[20]The term is a "sardonic reference to the broken heart that supposedly justified a breach of promise suit." Heartbalm Note, *supra*, at page 1771, footnote 4, and at page 1778 ("derisive term"). The term covers the "common law sexual torts of seduction, breach of promise to marry, criminal conversation and alienation of affections." (Larson, *"Women Understand So Little, They Call My Good Nature 'Deceit' ": A Feminist Rethinking of Seduction* (1993) 93 Colum. L. Rev. 374, 394, fn. 85 [hereinafter Larson] [the quotation in the title of the article is taken from Don Giovanni's description of himself in Mozart's opera]. The common theme of the four torts was sexual misconduct. (*Ibid.*)

[21]See Larson, *supra*, at page 395. See also *Waddell* v. *Briggs* (Me. 1978) 381 A.2d 1132, 1135 ("Legislatures throughout the nation viewed [heart balm] actions as being used to cause extreme embarrassment and humiliation to defendants, oftentimes innocent victims of circumstantial background conditions, enabling unscrupulous plaintiffs to obtain lucrative settlements by the mere threat of a breach of promise to marry proceeding."); *Pavlicic* v. *Vogtsberger* (1957) 390 Pa. 502 [136 A.2d 127, 131] (action "so misemployed" that "evil of abuse exceeded" the "occasional legitimate benefit").

[22]See Heartbalm Note, *supra*, at page 1776: "The second reason cited for the enactment of the heartbalm acts is that men's fears of excessive verdicts and of the scandal surrounding breach of promise suits prompted women to bring or threaten to bring unfounded suits and thereby extort large out-of-court settlements. In fact, some of the heartbalm acts state plainly that abuse by unscrupulous people filing meritless claims was the most important reason for enacting the statute." Professor Larson notes that the New York Times quoted the author of that state's anti-heart-balm statute as saying it would end the "tribute of $10,000,000 paid annually by New York men to gold-diggers and blackmailers." (Larson, *supra*, at p. 395, quoting *Ban on Heart Balm Is Made State Law*, N.Y. Times (Mar. 30, 1935) at p. 3.)

In *Langley*, the bride was the personnel director and presidential secretary of an insurance company who resigned her position on the defendant's representations "that he intended to marry her, to consummate the marriage, and to maintain a normal and natural marital relationship." (46 Cal.2d at p. 602.) The couple had a ceremony, but the bride soon discovered that the groom had no intention of consummating the marriage or "maintain[ing] a normal and natural marital relationship," nor did he ever. (*Ibid.*) After obtaining a decree of annulment, she sued the groom for fraud. The case reached our Supreme Court after the trial court sustained a demurrer.

The high court majority devoted a paragraph to the anti-heart-balm statute, reasoning that the code section "was only intended to abolish causes of action based on an alleged breach of contract." (46 Cal.2d at p. 603.) Because the case at bar was a fraud cause of action sounding in tort, it was "not barred by Civil Code section 43.5, subdivision (d)." (*id.* at p. 603.)

The three dissenters in *Langley* devoted considerably more space to the matter. The case was "essentially" one for breach of promise of marriage (see 46 Cal.2d at pp. 604 & 605 (dis. opn. of Spence, J.)). The fraud label was a mere circumvention of the statute abolishing the breach of promise action (*id.* at p. 605, citing 158 A.L.R. 618, 624) and it made no difference there was a ceremony: breach of promise of marriage as used in the statute included breaches of promise to consummate the marriage as well as go through with the ceremony itself. (46 Cal.2d at p. 606.)

The *Langley* majority opinion played to terrible reviews. (See *In re Marriage of Buckley* (1982) 133 Cal.App.3d 927, 932 [184 Cal.Rptr. 290] ["*Langley* engendered considerable criticism."]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 691, pp. 792-793 ["Law review comment on the decision was uniformly critical."]; see e.g., Note, *Husband and Wife —Annulment—Actions Between Spouses—Breach of Promise of Marriage* (1957) 30 So.Cal.L.Rev. 548, 550 [". . . the court has placed California in a singular position and has possibly subverted an important aspect of this state's anti-heartbalm legislation"].) One commentator has noted that *Langley* itself precipitated a "second flurry of criticism" of heart-balm actions.[23]

The Legislature responded to *Langley* in 1959 by adding new section 43.4 to the Civil Code: "A fraudulent promise to marry or to cohabit after marriage does not give rise to a cause of action for damages." Five years later the impact of the new statute was tested in *Boyd* v. *Boyd* (1964) 228 Cal.App.2d 374 [39 Cal.Rptr. 400], a case with facts similar to, and perhaps even a little more sympathetic than, *Langley*.

---

[23]Heartbalm Note, *supra*, 83 Mich. L.Rev. at page 1774, footnote 15.

In *Boyd*, the plaintiff was a woman who was receiving both Veterans and Social Security payments because she was a widow. She married the defendant, but after two days he left her and refused to live with or support her. To add insult to injury, the Veterans' and Social Security Administrations cut off payments to her because of the marriage. The widow then sued the defendant for breach of oral promise to live with and support her and for fraudulently promising (with full knowledge of the government payments) to live with and support her. She also alleged a cause of action for negligence, i.e, that the defendant "negligently married her or negligently left her without reasonable care as to her support." (228 Cal.App.2d at p. 376.) The appellate court got the case after a general demurrer was sustained.

The court organized its opinion by each cause of action. The suit for breach of an express promise of support was barred by Civil Code section 43.5, subdivision (d), the 1939 anti-heart-balm statute. Taking a cue from the well-known bundle of sticks metaphor in property law, the appellate court reasoned that marriage, as an institution, encompassed a "bundle of expectations and commitments," and each stick in the bundle—not just the expectation of economic support—was covered by the anti-heart-balm statute. (228 Cal.App.2d at p. 378.)[24] If Civil Code section 43.5, subdivision (d) prohibited actions seeking "compensation for outraged affection or loss of companionship," it also prohibited actions seeking "loss of expected support." (*Id.* at p. 379.)

The fraud cause of action, on the other hand, was precluded by Civil Code section 43.4, the 1959 response to *Langley*. Here the court reasoned that the "gravamen" of the cause of action was the defendant's fraudulent promise to cohabit after marriage. (228 Cal.App.2d at p. 381.) The court's approach was to look to the substance of the facts, not the convenient appellation "fraud" attached to them. If the "legal character of the injury" and the "character of the litigation objective" entailed the exploration of a "suitor's mind to determine the sincerity of his marriage proposal," then the substance of the claim was "within the jaws of section 43.4." (228 Cal.App.2d at p. 381.) And it made no difference that the plaintiff's claim was based on a loss of "tangible character." The court said, "The enactment of section 43.4 following and with a plain view of *Langley* v. *Schumacker* demonstrates a vigorous legislative policy which should not be sapped by refined distinctions shaped to fit hardship cases." (228 Cal.App.2d at pp. 381-382.)

The *Boyd* court dealt more summarily with the negligence count. The court simply noted that some actions are based "purely" on breach of

---

[24]"In outlawing breach of promise actions, section 43.5, subdivision (d), aims at lawsuits in which one party or the other seeks financial compensation for loss of this group of expectations and commitments."

promise and cannot be transmuted into tort actions by means of "transparent pleading" to circumvent a statutory bar. (228 Cal.App.2d at p. 382.)

In 1982, Civil Code section 43.4 was again called into play in *In re Marriage of Buckley, supra,* 133 Cal.App.3d 927. A cardiologist sued his former "wife" (the marriage had previously been annulled) for fraud and concealment. She had not told him when they married that her prior marriage had not yet finally been dissolved. (*Id.* at p. 930.) Again the court looked to the essence of the action. His action was "essentially a 'heart balm' action seeking to punish wife for her alleged fraudulent misrepresentations," and therefore barred by section 43.4. (133 Cal.App.3d at p. 934.)

■ If there is anything clear from the swift reaction to *Langley,* it is that the fact of false representations, even fraudulent representations, is not enough, by itself, to escape California's anti-heart-balm statutes.

While we should not be so presumptuous as to assume that love and sexual desire are in every case always part of the "bundle of expectations" of marriage, human experience suggests that most of the time they are.[25] Hence, even if such representations are "fraudulently" false,[26] they still substantively come under the rubric of the words "promise of marriage," or, to be more precise, "cohabitation after marriage" as they are used in Civil Code section 43.4. Indeed, even if, as the court in *Boyd* pointed out, the word "cohabitation" is something more than " 'a delicate euphemism for copulation,[27]' " it still encompasses copulation. Bonnette's false statements that she loved and sexually desired Ronald thus clearly come within the legal category of a fraudulent promise to "cohabit" after marriage.

At this point the policy behind the anti-heart-balm statutes bears some elaboration. Plainly, these statutes not only preclude certain "old fashioned" causes of action, but also embody a basic reluctance on the part of both the Legislature and the judiciary to allow recovery for promises of love. This reluctance stems, no doubt, from the sheer unseemliness of litigating tender

---

[25]At least in the modern world of companionate marriage, where feeling and sentiment are part of the relationship. (See Posner, Sex and Reason (1992) at p. 45 [hereinafter Posner] [contrasting companionate marriage with arranged marriage, with its emphasis on male sexual desire, financial arrangements and heirship]). There are countless stories, of course, where a prospective bride or groom lacked all love or sexual desire for his or her spouse-to-be in situations where marriages were arranged.

[26]Assuming, for sake of argument, that protestations of love and sexual desire could ever implicate the scienter necessary for fraud; human beings are far more complex than the typical language employed in form fraud complaints.

[27]*Boyd, supra,* 228 Cal.App.2d at page 381, quoting 1 Armstrong, California Family Law (1953) at page 7.

matters of romantic or sexual emotion in courts of law.[28] Using the courts to distinguish "between a false statement of one's feelings and a change in those feelings" presents, in Judge Posner's phrase, "exquisitely difficult" problems of proof.[29] Some courts have simply drawn a line around certain "intensely private" matters—even if they *do* implicate false representations.[30]

One of the most oft-cited breach of promise cases sounding this "privacy" theme is *A.B.* v. *C.D.* (E.D.Pa. 1940) 36 F.Supp. 85. There, the plaintiff agreed to marry the defendant, and for the next three years (it was a long engagement) expended large sums of money in contemplation of the impending marriage. She sued when the defendant declared it had never been his intention to marry her. From this the plaintiff argued that hers was a case that "smack[ed] of fraud," rather than breach of promise, because there never was a "meeting of the minds" to establish a contract to marry. (*Id.* at p. 86.) After examining the anti-heart-balm statutes of both New York and Pennsylvania (the respective states of the parties), the federal district court perceived a broad policy against litigating the sincerity of marriage promises. "The legislatures did not intend that courts should explore the minds of suitors and determine their sincerity at the moment of proposal of marriage but rather declared it to be the policy of the state that in the event a breach of the promise occurs relief will be denied in the courts." (*Id.* at p. 87.) Years later the court in *Boyd* would cite this language from *A.B.* in discussing whether a cause of action could be based on a "fraudulent promise to live with and support" the plaintiff. (See *Boyd* v. *Boyd, supra*, 228 Cal.App.2d at p. 381.)[31]

---

[28]There is perhaps some of this theme in Trial by Jury, which relies on the juxtaposition of delicate affairs of the heart (particularly as the sentimental Victorians would have seen it) with the formality of legal procedure. Somewhat the same thing seems to have happened in the pleadings in the case before us. See footnote 8, *ante*.

[29]See Posner, *supra*, at page 393. Judge Posner is referring to the tort of seduction by false pretenses, which, we would imagine, usually presents comparatively *less* difficulties of proof than the generalized protestations of love and sexual desire involved in the case before us.

[30]See *Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640, 643 [164 Cal.Rptr. 618, 31 A.L.R.4th 383] (no recovery for false representation of use of birth control pills against woman who subsequently bore plaintiff's child).

[31]Privacy has also been the focus of cases dealing with false representations of use of birth control. (Compare *Stephen K.* v. *Roni L., supra*, 105 Cal.App.3d 640, 643 [affirming dismissal of cross-complaint in paternity action based on mother's false representation she was taking birth control pills because claim arose out of "intensely private" conduct] with *Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 375, 380-381 [193 Cal.Rptr. 422] [reversing dismissal of woman's complaint for battery and deceit based on false representation by defendant that he was sterile, and rejecting notion that privacy should "insulate a person from all judicial inquiry into his or her sexual relations"]. *Perry* v. *Atkinson* (1987) 195 Cal.App.3d 14, 19-20 [240 Cal.Rptr. 402] [affirming dismissal of woman's fraud and deceit cause of action for pain caused by abortion done in reliance on defendant's promise he would impregnate plaintiff

We need not declaim generally on the topic of "sexual fraud,"[32] to be able to ascertain that the "sexual fraud" (as it were) in *this* case is not actionable. Ronald's act of arranging property to be taken in joint tenancy was without doubt *inextricably* related to the fact that he married Bonnette in reliance on her false statement that she had sexual desire for him. The very nature of the "fraud" is bound up in Bonnette's sincerity concerning some of her most intimate feelings and desires. In a less private context Justice Scott once wrote, "The courts should stay out of the bedroom." (*Barbara A. v. John G., supra,* 145 Cal.App.3d 369, 386 [193 Cal.Rptr. 422] (dis. opn. of Scott, J.).) He was writing in a case arising out of an ectopic pregnancy because an attorney who had sex with a client lied about his sterility. How much more applicable are his words here, where the statement was one of intimate feelings leading to a marriage.

Words of love, passion and sexual desire are simply unsuited to the cumbersome strictures of common law fraud and deceit. The idea that a judge, or jury of 12 solid citizens, can arbitrate whether an individual's romantic declarations at a certain time are true or false, or made with intent to deceive, seems almost ridiculously wooden, particularly where the statements were made prior to marriage and the marriage lasted more than 13 years. "The judiciary should not attempt to regulate all aspects of the human condition. Relationships may take varied forms and beget complications and entanglements which defy reason." (*Douglas R. v. Suzanne M.* (1985) 127 Misc.2d 745 [487 N.Y.S.2d 244, 245-246].)[33] Love has been known to last a lifetime, but it has also been known to be notoriously evanescent. These are matters better left to advice columnists than to judges and juries. With *A.B.* and *Boyd* we agree that courts should not be in the business of probing a suitor's state of mind.

One more aspect of the policy against heart balm suits also merits some discussion. That is, breach of promise suits are fundamentally incompatible with a statutory scheme of no-fault divorce. Either concept allows the ready circumvention of the other.

---

later] took *Stephen K.*'s side of the controversy, declaring it was the more "sound[ly]" reasoned of the two cases. Citing *Boyd, supra,* 228 Cal.App.2d at page 377, and Civil Code section 43.4, *Perry* reasoned that if the law did not provide a remedy for a fraudulent promise to "fulfill the rights, duties and obligations of a marriage relationship," logically it did not provide any remedy for a "fraudulent promise by a married man to impregnate a woman not his wife." (See 195 Cal.App.3d at p. 19.) As the present case does not involve pregnancy, we are spared the problem of reconciling (or choosing between, if irreconcilable) *Stephen K.* with *Barbara A.*)

[32]The issue is the focal point of Professor Larson's article mentioned in footnote 20, *ante.*

[33]Or, as a writer of somewhat older vintage expressed a similar idea, there are some "things which are too wonderful," among which is "the way of a man with a maid." (Proverbs 30:18-19.)

On the one hand, the old-fashioned breach of promise of marriage action at common law held out the promise of "a large assortment of tort and contract damages" in addition to any actual property with which the plaintiff may have parted. The plaintiff could recover for mental and emotional suffering, damage to reputation, humiliation, embarrassment and even "loss of worldly advantage," i.e., the expectation of sharing in the defendant's wealth and social position, as well as punitive damages.[34] All of this put a hefty premium on a case (unlike, say, that of the widow in *Boyd* who lost her benefits) where the plaintiff may have suffered very little in terms of tangible damages or out-of-pocket loss.

This hefty premium can be circumvented, however, where there is no-fault divorce by the expedient of not breaching the agreement to marry anticipatorily.[35] The unwilling spouse need only turn around and file a petition for dissolution after the marriage. In contrast to the emotional distress or punitive damages available for breach of promise, recovery in dissolution proceedings is basically limited to half the community property and appropriate support and attorney fee orders—no hefty premiums for emotional angst. Yet it makes no sense that the civil law should penalize unilaterally breaking an engagement much more severely than it would unilaterally ending a marriage. No one would dispute that the state has a stronger interest in keeping marriages intact than it does in holding unwilling-spouses-to-be to their promises.

The contrast also works in the other direction. The limited recovery available in dissolution actions is easily circumvented if spouses are allowed to sue each other because of love-related promises. As in the present case, a couple undergoing the unpleasantness of a dissolution could wind up in civil court litigating *the very emotional underpinnings of the marriage itself* in a "fraud" action. This is just another name for "fault" divorce.

Ronald reminds us that in *In re Marriage of McNeill, supra*, 160 Cal.App.3d 548 this court upheld a judgment in a civil fraud action between spouses based on factual misrepresentations by one of the spouses. However, both the *nature* and, for the most part, the *time* of the misrepresentations in *McNeill* were different from the misrepresentations here. The statements in McNeill were all made *after* the marriage and had nothing to do with love, sex or passion.

In *McNeill*, a wife falsely told her husband that she was an attorney, had a master's degree in accounting, was suffering from cancer, and had an

---

[34]Heartbalm Note, *supra*, 83 Mich. L.Rev. at page 1774.

[35]At common law it was no defense to change one's mind and offer to go through with the marriage.

outstanding premarital judgment against her that could affect their assets. In reliance on these statements, the husband put the title on his separate property home into their joint names, and moved out of the home. The wife later falsely told the husband she had 90 days to live and encouraged him to put their assets in trust, and then gave him documents to sign which, in reality, transferred all his assets to her. (See 160 Cal.App.3d at p. 555.) None of the statements found actionable in *McNeill* went to one party's feelings about the other.

## B. *The "Unsexy" Remainder of the Case*

Even assuming, for sake of argument, there is anything left of Ronald's civil suit after it is stripped of its basis in false statements of love and sexual desire, it is very clear that the trial court had no jurisdiction to consider it.

Bonnette filed her dissolution action in May 1991. Ronald made his appearance by way of a response before the end of July. It was not until October that Ronald filed his civil action.

In her dissolution action, Bonnette asserted that each of the five parcels (as well as others) were items of community property subject to division by the family law court. There was at least a colorable basis for her assertion.[36]

After a family law court acquires jurisdiction to divide community property in a dissolution action, no other department of a superior court may make an order adversely affecting that division. (*In re Marriage of Schenck*

---

[36]With the exception of the Pine Street property, all of the properties at issue were acquired during the marriage. These were the Killdee, Ebell, Heather and Mt. Humphries properties. These four properties are thus presumed to be community property by virtue of their acquisition date. (See Fam. Code, § 760; Civ. Code, former § 5110.) The Pine Street property was put into joint tenancy during the marriage in 1978, and would be presumed to be community property by virtue of the title presumption in Civil Code former section 5110, as it was interpreted at the time. (*In re Marriage of Lucas, supra*, 27 Cal.3d 808, 814-816 [absent agreement that spouse contributing separate property was to retain separate property interest in house taken in joint tenancy, title presumption in former section 5110 could not be rebutted]; *In re Marriage of Lachenmyer* (1985) 174 Cal.App.3d 558, 562, fn. 5 [220 Cal.Rptr. 76] [transfer by husband during marriage in 1979 of condominium owned by him prior to marriage into joint tenancy made condominium community property]; see also Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1993) ¶¶ 8:25-8:25.1 ["Property acquired before marriage is the separate property of the acquiring spouse, as is property obtained during marriage but which can be *traced* to an acquisition before marriage. . . . The above rule gives way, however, whenever a title presumption precludes tracing to establish a separate property interest. At a minimum, there will have to be a *Lucas* oral or implied agreement . . . ."].)

We need not decide at this juncture whether the Killdee, Ebell, Heather and Mt. Humphries properties would also be presumptively community under the joint tenancy title presumption.

(1991) 228 Cal.App.3d 1474, 1483-1484 [279 Cal.Rptr. 651] [civil law and motion department had no authority to order the sale of the family home based on husband's accrued support arrearages when the family law court still had jurisdiction to divide the community interest in that home]; Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:237.2 ["Pending the ultimate valuation and division, no other department of the superior court may issue orders that would adversely affect the family law court's ability to exercise its reserved jurisdiction."].) Obviously, the actual division of community property is affected by the characterization of specific assets, so the issue of characterization also reposes in the family law court. (See *id.* at ¶ 8:199.1 [Family Law Act "subject matter jurisdiction has always included authority to resolve all *characterization* disputes . . . ."].)

 Here, the civil trial court in effect usurped the power and obligation of the family law court to determine the character of the five properties. The civil court's judgment is necessarily predicated on the idea that the five properties which were put into joint tenancy were all Ronald's separate property. By imposing trusts on Bonnette's ostensible interests in the five properties, the civil court was removing from the family law court the power to characterize and divide those properties as community. Given that the family law court *already* had subject matter jurisdiction to divide the community property, the civil trial court had no jurisdiction to so act.

If the family law court concludes that the properties are community in character, it then will have jurisdiction to include them in the division of the community estate and that will end the matter. However, even if the family law court concludes that they are separate in character, and even further assuming that Bonnette refused to convey the properties back to Ronald, the family law court will *still* order their return as long as either party requested it. Under Family Code section 2650 (formerly Civ. Code, § 4800.4, subd. (a)), the family law court has jurisdiction "at the request of either party, to divide the separate property interests" of the parties held in joint tenancy.

It is ludicrous, of course, to allow a separate civil action solely on the speculation that some item of property within the marital estate *might* be the plaintiff spouse's separate property, the defendant spouse *might* not return it, and *neither* spouse would request the family law to order the return. Such a scenario is nothing less than silly, especially in light of the fact all the plaintiff spouse need do in the family law action is make a request of the family law court. If Ronald has any basis for his claim that the five properties which are the subject of the judgment here are his separate property, there is no good reason why Ronald cannot litigate that claim in the family law court.

*Porter* v. *Superior Court* (1977) 73 Cal.App.3d 793 [141 Cal.Rptr. 59], relied upon by Ronald, is consistent with our analysis. In *Porter* , a husband transferred a house he owned prior to marriage into joint tenancy with his wife. She later filed for dissolution claiming the house was community property. After that the husband filed a separate civil action to set aside the deed, claiming his wife fraudulently induced the transfer into joint tenancy under the guise of marital estate planning when she really intended to claim the property in a dissolution action. (*Id.* at pp. 796-797.) Eventually the husband obtained an order removing the *dissolution* action from the trial calendar. The wife sought a writ of mandate to vacate that order, and compel the trial court to regularly proceed with the trial of all issues in the dissolution, including the disputed character of the house. The appellate court granted the writ.

After first dispensing with the husband's contention that allowing the family law proceeding to go forward on the issue would unconstitutionally interfere with his right to a jury trial on the issue (73 Cal.App.3d at pp. 797-801), the court reasoned that the husband *could not unilaterally deprive* the wife of her opportunity to litigate the status of the property in the dissolution proceeding by filing a separate civil action. (*Id.* at p. 805.) The court then pointed out that if the family law court determined the house was community, that would "put an end to the matter." (*Ibid.*) However, if the family law court determined the house was separate, it could abate its proceedings concerning that property and reserve jurisdiction to act if the property was not disposed of in the separate action. "In any event," said the court, it was error for the trial court to remove the family law proceedings from the trial calendar. (*Ibid.* )

*Porter* was decided before the enactment, in 1985, of Civil Code former section 4800.4, subdivision (a), now Family Code section 2650. At the time of the *Porter* decision the family law court did not have the jurisdiction (as long as either spouse requested it) to order the return of separate property held in joint tenancy. Consequently, *Porter* indicated that the family law court should "exercise restraint" in exercising jurisdiction "over the separate property of the parties," (73 Cal.App.3d at pp. 795-796). The opinion did not specifically address the question of whether the trial court in the separate civil action would have had jurisdiction to determine the issue of the character of the house prior to the determination of the issue in the dissolution action. The reasonable implication of the court's decision, however, is that the civil court would *not* have any such power.

The most that can be extracted in Ronald's behalf from the *Porter* case is that the court did *not* take the opportunity to observe that the civil court had

no jurisdiction to act in the face of an ongoing family law proceeding. But that proves nothing. The procedural posture in *Porter* was that of a writ petition seeking the reversal of an order removing the family law action from the trial calendar, not, as in the case before us, of an appeal from a judgment in a separate civil action determining issues which were first committed to the family law court.

## C. *The Family Law Attorney Fee Denial*

■ The second appeal before us centers on the question of whether the family law court erred when it categorically refused to award Bonnette any fees for the defense of the civil action.[37] The family law court reasoned that the civil court's decision not to consolidate the actions was dispositive on the issue.

Not so. The applicable statute (Civ. Code, former § 4370, subd. (a), now Fam. Code, § 2030, subd. (a)) plainly allows the family law court in a dissolution action to make an award of attorney fees pending completion of the family litigation or "any proceeding related thereto." While it is true that "relatedness" is normally a factual question for the trial court (see *In re Marriage of Green, supra*, 6 Cal.App.4th 584, 591), that hardly means the civil court's decision not to consolidate ended the matter. ■ A motion to consolidate under section 1048 of the Code of Civil Procedure is predicated on the assumption that two or more actions already "involv[e] a common question of law or fact." The motion requests the court to exercise its *discretion* to consolidate the actions (the court "*may* order a joint hearing or trial of any or all the matters in issue in the actions," italics added). Therefore it is possible that actions may be thoroughly "related" in the sense of having common questions of law or fact, and still not be "consolidated," if the trial court, in the sound exercise of its discretion, chooses not to do so.

■ Most of Ronald's argument on the relatedness issue consists of distinguishing this case from *Green, supra*, 6 Cal.App.4th 584. There, the court affirmed an award of attorney fees to help a wife pay for a number of related civil actions, including a malicious prosecution action against her family law attorney in which she was not even a party. The court affirmed the award because the record was clear that the husband had brought the related actions in an effort to gain an advantage over the wife in the family law action, including dissuading her attorney from pursuing the family law matter. (*Id.* at pp. 589 & 592.)

---

[37]The denial of a request for attorney fees pendente lite is appealable because it possesses all the elements of a final judgment on the issue of whether a spouse may be able to obtain such fees. (See *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368-370 [134 Cal.Rptr. 197, 556 P.2d 297].)

It is true, of course, that in *Green* the civil actions were related to the family law action because they had been brought with the improper motive of bringing pressure on the opposing party *in the family law action.* Indeed, the improper motive was the "glue" which connected the family law action with the separate civil action. However, we reject the argument that an improper motive is a *prerequisite* for a civil action to be "related" to a dissolution action.

To require an improper motive for filing a civil action before it may be deemed to be "related" to the family law action within the meaning of Civil Code section 4370 (now Fam. Code, § 2030, subd. (a)) would be to read into the statute a requirement that is not there. (This is not to say that actions cannot be related *by virtue of* an improper motive, which is what happened in *Green.*) The statute says "related," and we may take it that a civil action is certainly related to a family law action if it involves matters which should have been litigated in the family law action in the first place. (See *In re Marriage of Green, supra,* 6 Cal.App.4th at p. 590, quoting *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1497 [2 Cal.Rptr.2d 690].)

Here, the civil action certainly involves matters which were the province of the family law court in the first place. The entire civil action is predicated on an assumption—the separate character of the five pieces of property— which was, as we have just explained, going to be tested in the family law court. The expense associated with the civil action was completely avoidable. Ronald should have waited for the family court to decide the issue first.

Thus even if we assume that Ronald acted completely in good faith in filing his civil action, the fact remains the filing of the civil action sought to preempt the family law court from determining issues it already had jurisdiction to determine. Filing a separate civil action was duplicative of the family law action and wasteful of the parties' resources. The only part of it not otherwise encompassed by the anti-heart-balm statutes is based on Bonnette's alleged oral agreement to hold certain of Ronald's property in trust. This part is wholly dependent on the characterization issue, and specifically turns on whether Ronald and Bonnette in fact had such an oral agreement. Adjudication of such oral agreements is garden-variety stuff for family law courts. (Cf. *In re Marriage of Lucas, supra,* 27 Cal.3d 808.)

Because the two actions were related and consolidation was not a "condition precedent" to a request for attorney fees in a related proceeding, the

family law court erred in categorically rejecting Bonnette's request.[38] Because Ronald's action is clearly duplicative of the family law action, Bonnette has been put to a wholly unnecessary legal expense, regardless of whether Ronald deliberately put her to that expense for purpose of pressuring her in the family law action. Accordingly, on remand, not only should the family law court reconsider the matter of fees, but fidelity to the statute requires that she be awarded reasonable fees for defending the civil action.

### D. *The Expert Fee Order*

██ The final appeal is taken from an order awarding Ronald expert witness fees in the civil action pursuant to section 998 of the Code of Civil Procedure (party liable for certain fees in civil action if it rejects settlement offer and obtains a less favorable judgment). The order obviously cannot stand in light of our decision reversing the judgment in the civil case.

### IV. CONCLUSION

After Gilbert wrote Trial by Jury, he would pen another line applicable to this case: "Gild the farthing if you will, But it is a farthing still."[39] So it is with lawsuits. This one is still a breach of promise action even if it is titled fraud.

The trial court erred in not dismissing Ronald's complaint, most of which was substantively for breach of promise and any arguable remainder was beyond the jurisdiction of the civil court in light of the ongoing family law action. The judgment in the civil action is therefore reversed with directions to enter judgment in favor of Bonnette. The expert fee order is likewise reversed.

The order in the family law action denying Bonnette attorney fees to defend the civil action is reversed, with directions to the family law court to award reasonable fees to Bonnette for her expenses in defending the civil action.[40] Bonnette is to recover her costs on appeal. The character of her ostensible interests in the five properties at issue can now be decided by the

---

[38]It makes no difference that Bonnette agreed to have the property issues in the family law action held in abeyance pending the outcome of the civil action. Given the remarkable nature of Ronald's lawsuit, the refusal of the civil trial court to dismiss the case, and the denial of her consolidation motion, Bonnette had little practical choice but to agree to stay the family action and concentrate her resources on the civil action. Of course, in retrospect, it seems the stipulation was precisely the opposite of what it should have been.

[39]H.M.S. Pinafore, act II. See Jefferson, *supra*, at page 85.

[40]The fee award, of course, must be consistent with Family Code sections 270 (payor spouse must have ability to pay fee award) and 2032 (fee awards must be just and reasonable under the relative circumstances of the parties).

court which should have decided the matter in the first place—the family law court.

Sonenshine, J., and Moore, J., concurred.

A petition for a rehearing was denied March 14, 1994.