Filed 11/7/16

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>MARY H.,<br><br>     Defendant and Appellant. | F071282<br><br>(Super. Ct. No. MI5859)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Julia Freis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Christopher J. Rench, and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Mary H. was taken into custody for psychiatric evaluation and treatment for up to 72 hours pursuant to Welfare and Institutions Code section 5150.[1]  (See fn. 6, *post*.)  Consequently, after her release, she was banned from owning, possessing, controlling, receiving, or purchasing any firearm for five years.  (§ 8103, subd. (f)(1).) Mary petitioned the Superior Court of Kern County to lift the prohibition.  Following a hearing, the court denied the request, finding the preponderance of the evidence established Mary would not be likely to use firearms in a safe and lawful manner.  (*Id.*, subd. (f)(6).)

On appeal, Mary contends section 8103, subdivision (f)(6), employs an unconstitutional standard of proof and is unconstitutionally vague.  She further asserts the evidence did not sufficiently support the superior court's denial of her petition.  We ordered the parties to address the issues of whether the superior court's order denying Mary's request for relief from the firearm prohibition is appealable, and whether Mary is entitled to appointed counsel.

We find the superior court's order appealable, but find Mary is not entitled to appointed counsel.  We also conclude section 8103, subdivision (f)(6), employs a constitutional standard of proof and is not unconstitutionally vague.  Substantial evidence supported the trial court's denial of Mary's petition.

### FACTUAL AND PROCEDURAL HISTORY

On the morning of August 24, 2014, Mary baked cookies for her boyfriend and his students.[2]  She phoned her boyfriend and visited his workplace but was unable to get in

---

[1]    Because this matter relates to a hold under the Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code, § 5000 et seq.), we abbreviate Mary's name to protect her privacy. (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1549-1550, fn. 1 (*Jason K.*).)

Unless otherwise indicated, subsequent statutory citations refer to the Welfare and Institutions Code.

[2]    References to unspecified dates in the factual and procedural history are to the year 2014.

touch with him. Upset, Mary returned home, drank two shots of tequila, and overdosed on Zofran and Percocet. At or around 2:30 p.m., she called her adult daughter in Ohio and stated "[s]he was feeling depressed," "no one care[d] for her," "she was going to end her life," and "she can't handle [her boyfriend]." At or around 5:30 p.m., a tearful Mary called her daughter again and reiterated she was "feeling anxious" and "ending her life." Mary's daughter phoned Mary's boyfriend who contacted 911. A sheriff's deputy and paramedics arrived at Mary's home, where Mary confirmed she tried to harm herself. In particular, she told paramedics, " '[N]o one cares for me so I wanted to end it.' " Mary was transported to Kern Medical Center (KMC), where she became apneic in the emergency room. Her condition eventually stabilized following oxygen supplementation, intubation, and intravenous administration of Narcan. Mary informed an emergency department physician "she was actively trying to commit suicide."

In an August 26th phone call with KMC staff, Mary's daughter related Mary exhibited symptoms of depression for at least 10 years.[3] She also had frequent mood swings and "strange thoughts in her mind [she] thinks . . . are for real." Prior to the most recent suicide attempt, Mary had tried to kill herself via drug overdose on four separate occasions. Nevertheless, she "thinks she has no psychiatric problems and refuses to see a doctor for it."

The sheriff's deputy completed an "Application for 72-Hour Detention for Evaluation and Treatment" (some capitalization omitted) pursuant to section 5150, asserting probable cause to believe Mary was a danger to herself. Mary was transferred to KMC's psychiatric unit for evaluation and treatment on August 27. She told KMC staff she did not suffer from depression, anxiety, mania, or psychosis and did not try to kill herself at any point. With regard to the August 24th incident, Mary claimed she

---

**3** The medical record shows Mary was prescribed Paxil in 2002 but stopped taking the medication after two months. Mary's daughter informed KMC staff Mary was either inconsistent or noncompliant with her treatment.

ingested alcohol and Percocet for her back pain. She acknowledged she spoke to and asked for help from her daughter but "doesn't remember what happened after." A mental status examination revealed poor impulse control, insight, and judgment. KMC staff diagnosed "[m]ajor depressive disorder severe without psychotic features" and opined Mary was likely to harm herself as a result of a mental health disorder. On August 28, Mary was deemed "psychiatrically stable" and discharged.

On November 17, Mary petitioned the superior court for an order restoring her right to own, possess, control, receive, or purchase firearms. A hearing was held on January 14, 2015. The district attorney offered, and the superior court admitted into evidence, Mary's medical record. Mary testified on her own behalf:

> "I am not a danger to myself or others. And I live in Caliente out in the country, and we have rattle snakes, and I had to kill one in July. [My boyfriend] has a gun and I would like to be able to have the guns out. We have them all locked up. [¶] . . . [¶]
>
> ". . . I'm currently seeing a pain specialist and getting acupuncture so I am getting my pain management under control. I don't have any prescription for any narcotics. I take Excedrin migraine . . . . The prescription that I overdosed on was filled in Ohio in March of 2012. I don't take them very often so I saved them and the hospital confiscated that and destroyed them. I have no prescription. I have no more narcotics. [¶] . . . [¶]
>
> ". . . I have not dr[u]nk. I drink very seldom. And since this episode, I will not drink alcohol ever again. I'm allergic to a lot of stuff and I react to it. I'm sensitive to substances. [¶] . . . [¶]
>
> ". . . We had just moved from Tehachapi to Caliente. I lifted a lot of boxes. I have . . . three herniated disks in my back, and I hurt real[ly] bad. I took the [Percocet] pills, and I accidentally drank alcohol and mixed them, which I have never done before and this episode happened. It was purely accident[al]. [¶] . . . [¶] . . . I drank it and I didn't think about taking the Percocets. . . . I didn't think about mixing, you know, I usually don't drink. [¶] . . . [¶] . . . I was upset and had a drink."

4.

The court denied Mary's request:

> "The burden of proof is by preponderance of the evidence for the People to show that the person would . . . not be likely to use firearms in a safe and lawful enforcement matter. [¶] The Court is concerned with the evidence as presented in the medical report that . . . has been disputed by [Mary] but has not been repu[dia]ted as far as the Court is concerned.

> "The evidence meets the burden of proof by a preponderance of the evidence. [Mary] is not stable enough to safely maintain and use firearms. She is a danger to herself, at least based on the medical evidence presented here, and a danger to others."

## DISCUSSION

### I. *The order is appealable.*

In their respective letter briefs, both parties cited *Knoll v. Davidson* (1974) 12 Cal.3d 335, 343, in which the California Supreme Court held "there is an appeal from a final judgment entered in a special proceeding" "unless the statute creating the special proceeding prohibits an appeal." The parties identically reasoned: (1) section 8103, subdivision (f), permits a person subject to the prohibition to make a one-time request for relief from the superior court; (2) said remedy constitutes a special proceeding under Code of Civil Procedure section 21; and (3) denial of the one-time request amounts to a final judgment. Furthermore, section 8103 does not explicitly preclude appeals. We, therefore, hold the superior court's order denying Mary's relief from the firearm prohibition is appealable.

### II. *Section 8103, subdivision (f)(6), employs a constitutional standard of proof.*

"Upon probable cause that a person is a danger to himself or others, that person may be detained in a mental health facility for 72 hours for treatment and evaluation." (*People v. Keil* (2008) 161 Cal.App.4th 34, 38 (*Keil*), citing § 5150.) "A person who has so been detained may not own, possess, control, receive or purchase any firearm for a period of five years after the detention . . . ." (*Keil, supra,* at p. 38, citing § 8103, subd. (f)(1).) "However, the individual may request a hearing to lift this prohibition."

5.

(*Jason K.*, *supra*, 188 Cal.App.4th at p. 1553; see § 8103, subd. (f)(3)-(4).) "The people of the State of California shall be the plaintiff in the proceeding" (§ 8103, subd. (f)(5)) and "shall bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner" (*id.*, subd. (f)(6)). "If the court finds that the People have not met their burden, the restriction is removed, and the person shall be entitled to own, possess, control, receive or purchase firearms, unless another legal restriction applies." (*Jason K.*, *supra*, at p. 1553, citing § 8103, subd. (f)(1).)

"'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. The burden of proof may require a party to . . . establish the existence . . . of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Evid. Code, § 115.)

"The function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" (*Addington v. Texas* (1979) 441 U.S. 418, 423 (*Addington*), quoting *In re Winship* (1970) 397 U.S. 358, 370 (conc. opn. of Harlan, J.).) "The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." (*Addington*, *supra*, at p. 423.) "At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion." (*Ibid.*; see *Lillian F. v. Superior Court* (1984) 160 Cal.App.3d 314, 320 ["A preponderance of the evidence standard . . . 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence . . . ."'"].)

On the other end of the spectrum is "a criminal case, . . . [in which] the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt." (*Addington*, *supra*, 441 U.S. at pp. 423-424, fn. omitted; see CALCRIM No. 220 ["Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true."].)

The intermediate standard of clear and convincing evidence " 'reduce[s] the risk [of error] to the [individual] . . . by increasing the [government's] burden of proof.' " (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1556, quoting *Addington*, *supra*, 441 U.S. at p. 424; see *Lillian F. v. Superior Court*, *supra*, 160 Cal.App.3d at p. 320 [" ' "Clear and convincing" evidence requires a finding of high probability.' [Citation.] Such a test requires that the evidence be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' "].) This standard, which "is less commonly used" (*Addington*, *supra*, at p. 424), tends to be seen in civil cases involving "interests . . . deemed to be more substantial than mere loss of money" (*ibid.*). (See, e.g., *Santosky v. Kramer* (1982) 455 U.S. 745, 768-770 (*Santosky*) [termination of parental rights]; *Addington*, *supra*, at pp. 431-433 [involuntary civil commitment]; *Woodby v. Immigration Service* (1966) 385 U.S. 276, 285-286 [deportation].)

"Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115; see *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546 ["The default standard of proof in civil cases is the preponderance of the evidence."]; see also *Conservatorship of Ben C.* (2007) 40 Cal.4th

529, 537 [LPS proceedings civil in nature].) " 'Law' includes constitutional, statutory, and decisional law." (Evid. Code, § 160.)

"An individual has a constitutional right to procedural due process when the government deprives an individual of a liberty or property interest." (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1556; accord, *Mathews v. Eldridge* (1976) 424 U.S. 319, 332.) "One component of procedural due process is the standard of proof used to support the deprivation" (*Jason K.*, *supra*, at p. 1556), which "must satisfy ' "the constitutional minimum of 'fundamental fairness' " ' " (*ibid.*). (Accord, *Santosky*, *supra*, 455 U.S. at pp. 754, 756, fn. 8.) "To determine whether a proof standard meets this constitutional minimum, the courts evaluate three factors: (1) the private interest affected by the proceeding; (2) the risk of an erroneous deprivation of the interest created by the state's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." (*Jason K.*, *supra*, at p. 1556; accord, *Santosky*, *supra*, at p. 754; *Mathews v. Eldridge*, *supra*, at p. 335.)

As noted, under section 8103, subdivision (f)(6), "[t]he people shall bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner." Mary, citing *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*) and *McDonald v. City of Chicago* (2010) 561 U.S. 742 (*McDonald*), argues the standard of proof should be clear and convincing evidence in view of procedural due process and the Second Amendment.

We find persuasive the analysis in *Jason K.*, in which the Fourth Appellate District upheld the preponderance of the evidence standard set forth in section 8103, subdivision (f)(6):

> "First, with respect to the private interest element of the due process test, an individual's right to possess firearms is of fundamental constitutional stature. (*Heller*, *supra*, 554 U.S. 570; *McDonald*, *supra*, 561 U.S. [742].) However, this constitutional right is subject to the state's traditional authority to regulate firearm use by individuals who have a

mental illness. (*Heller*, *supra*, 554 U.S. at p. 626.)[4]  Moreover, the length of the threatened loss is a relevant factor in analyzing the nature of the private interest. (*Santosky*, *supra*, 455 U.S. at p. 758.)  Under section 8103, the deprivation of the right is lengthy, but temporary, lasting for five years. Further, the infringement concerns the loss of property, and does not involve deprivation of physical liberty or severance of familial ties.  The deprivation is thus not akin to the types of cases such as termination of parental rights, civil commitment, withholding of nutrition/hydration, forced sterilization, or deportation where a clear and convincing evidence standard is typically imposed.  Additionally, although the loss of the right to possess firearms can impact an individual's ability to defend himself or herself, the deprivation does not leave the individual exposed to danger without recourse to other defensive measures, such as installing home security devices and summoning the police.

"Balanced against the individual's temporary loss of the right to possess firearms is the state's strong interest in protecting society from the potential misuse of firearms by a mentally unstable person. (*Rupf* [*v. Yan* (2000)] 85 Cal.App.4th [411,] 423 [(*Rupf*)] [noting that it is 'not unreasonable to conclude there is a significant risk that a mentally unstable gun owner will harm himself or others with the weapon']; see *Heller*, *supra*, 554 U.S. at p. 626; *McDonald*, *supra*, 561 U.S. at p. [786].)  Section 8103 (and its counterpart § 8102, which permits confiscation of firearms) are preventative in design; the fundamental purpose is to protect 'firearm owners and the public from the consequences of firearm possession by people whose mental state endangers themselves or others.' (*People v. One Ruger .22-Caliber Pistol* (2000) 84 Cal.App.4th 310, 315.)  These protective statutes 'limit the availability of handguns to persons with a history of mental disturbance . . . to protect those persons or others in the event their judgment or mental balance remains or again becomes impaired.' (*Rupf*, *supra*, 85 Cal.App.4th at p. 424.)

"Although the preponderance of the evidence standard requires the individual to share equally in the risk of an erroneous adjudication, this risk sharing is justified under circumstances where an individual exhibited a mental disorder sufficient to warrant hospitalization because of facts showing the individual may endanger himself or others. . . .  The statute

---

**4**     See *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1505 ("The holdings of *Heller* and *McDonald* address whether the Second Amendment protects the right to possess a handgun in the home for self-defense; they did not extend Second Amendment protections to persons whose firearms are seized because they were found to be a danger to themselves by reason of their mental health." fn. omitted).

places the burden on the government to show the individual would not be likely to use the weapons in a safe manner. (§ 8103, subd. (f)(6).) But if the government was required to satisfy this burden by clear and convincing evidence, this would increase the possibility that a person might be gravely injured or killed if the government failed to meet this rigorous proof burden. When the gravity of the potential consequences of allowing possession of guns by an individual with a history of a manifested mental disturbance is balanced against the temporary deprivation of access to these weapons, the balance weighs in favor of permitting proof by a preponderance of the evidence." (*Jason K.*, *supra*, 188 Cal.App.4th at pp. 1557-1559.)

In addition, we do not believe the risk of an erroneous deprivation—i.e., the second factor of the "fundamental fairness" balancing test—is so elevated as to override *Jason K.*'s holding. Before the firearm prohibition can be imposed on someone, that person must have been "(A) taken into custody as provided in [s]ection 5150 because that person is a danger to himself, herself, or to others,[5] (B) assessed within the meaning of [s]ection 5151,[6] and (C) admitted to a designated facility within the meaning of

---

**5** "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, . . . a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff . . . of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county may, *upon probable cause*, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services." (§ 5150, subd. (a), italics added.)

"Probable cause means '*specific* and *articulable* facts which, taken together with rational inferences from those facts, reasonably warrant [the] belief or suspicion' that the person is mentally disordered.' [Citation.]" (*In re Azzarella* (1989) 207 Cal.App.3d 1240, 1250.)

**6** "Prior to admitting a person to the facility for treatment and evaluation pursuant to [s]ection 5150, the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention." (§ 5151.)

[*fn. cont'd on next page*]

[s]ections 5151 and 5152 because that person is a danger to himself, herself, or others . . . .[7]" (§ 8103, subd. (f)(1); see *In re Azzarella*, *supra*, 207 Cal.App.3d at p. 1250 ["'[T]he[] . . . risk of erroneous deprivation . . . is minimized by the requirement of readily observable evidence of mental disorder."].)  After the prohibition is imposed, the person—upon his or her request—is afforded a mandatory court hearing.  (§ 8103, subd. (f)(3)-(5).)  Copies of the mental health treatment facility's reports delineating the legal grounds for the hold "shall be disclosed upon request to the person" (*id.*, subd. (f)(5)) and any information provided by the county behavioral health director of the hearing "about the detention of the person that may be relevant to the court . . . shall be disclosed to the person" (*ibid.*).  At the hearing, the person may introduce favorable evidence, subject only to Evidence Code section 352, and challenge unfavorable evidence.  (See § 8103, subd. (f)(5).)  If the superior court denies relief, the person may file an appeal.

Therefore, we conclude section 8103, subdivision (f)(6), employs a constitutional standard of proof.

---

" 'Assessment' . . . means the determination of whether a person shall be evaluated and treated pursuant to [s]ection 5150."  (§ 5150.4.)

**7**    "If the facility designated by the county for evaluation and treatment admits the person, it may detain him or her for evaluation and treatment for a period not to exceed 72 hours."  (§ 5151.)

"Each person admitted to a facility for 72-hour treatment and evaluation . . . shall receive an evaluation as soon as possible after he or she is admitted and shall receive whatever treatment and care his or her condition requires for the full period that he or she is held."  (§ 5152, subd. (a).)

" 'Evaluation' consists of multidisciplinary professional analyses of a person's medical, psychological, educational, social, financial, and legal conditions as may appear to constitute a problem.  Persons providing evaluation services shall be properly qualified professionals . . . ."  (§ 5008, subd. (a).)

### III. *Section 8103, subdivision (f)(6), is not unconstitutionally vague.*

"The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal . . . and . . . California Constitution[s]." (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567, citing U.S. Const., 5th & 14th Amends., & Cal. Const., art. I, § 7.) "To satisfy the constitutional command, a statute must meet two basic requirements: (1) [t]he statute must be sufficiently definite to provide adequate notice of the conduct proscribed; and (2) the statute must provide sufficiently definite guidelines . . . in order to prevent arbitrary and discriminatory enforcement." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1106-1107.) A statute will pass constitutional muster if it "(1) gives fair notice of the practice to be avoided, and (2) provides reasonably adequate standards to guide enforcement." (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 702; cf. *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [" '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' "]; *id.* at p. 1116 ["[A] law that is 'void for vagueness' . . . 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' "].)

"The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' [Citation.]" (*Williams v. Garcetti*, *supra*, 5 Cal.4th at p. 568.) " '[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the

practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded.' " (*People ex rel. Gallo v. Acuna*, *supra*, 14 Cal.4th at p. 1117.) "The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like. . . . [S]tandards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1128-1129; see *In re J.W.* (2015) 236 Cal.App.4th 663, 671 ["The number of common terms that courts have found not impermissibly vague is as varied as is our law."].)

Mary does not contend section 8103, subdivision (f)(6), fails to give fair notice. Rather, she claims the phrase "would not be likely to use firearms in a safe and lawful manner" is so vague as to allow arbitrary and discriminatory enforcement.[8] We disagree. We do not believe persons of common intelligence must guess the meanings of "not likely," "use," "firearms," "safe," or "lawful," as these words "are all of common usage" (*City of Costa Mesa v. Soffer* (1992) 11 Cal.App.4th 378, 387) and their meanings are either "common and generally accepted" (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 435) or "can be fairly ascertained by references to similar statutes or other judicial determinations, or to the common law or the dictionary" (*ibid.*).[9]

---

[8]    Mary seemingly asks us to address questions concerning various hypothetical scenarios. "The rule is well established . . . that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations." (*In re Cregler* (1961) 56 Cal.2d 308, 313.)

[9]    Mary asserts the test for vagueness is "more stringent when . . . 'the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights.' (*Colautti v. Franklin* (1979) 439 U.S. 379, 391.)" It is true that "[w]hile the basic standard against which statutes must be measured for vagueness is a constant, the

*IV.    Substantial evidence supported the superior court's order denying Mary's request for relief from the firearm prohibition.*

"We must 'affirm if "substantial evidence supports the court's determination that return of the firearms to appellant would be likely to result in endangering appellant or other persons." ' " (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1553, quoting *Keil*, *supra*, 161 Cal.App.4th at p. 38.)  "In determining whether a court's ruling is supported by substantial evidence, we view the whole record in a light most favorable to the ruling, resolving all evidentiary conflicts and drawing all reasonable inferences supporting the court's decision." (*Jason K.*, *supra*, at p. 1553; see *People v. Redmond* (1969) 71 Cal.2d 745, 755 ["Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it."].)  "If ' "there is 'substantial evidence,' the appellate court must affirm . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result." ' " (*Jason K.*, *supra*, at p. 1553, italics omitted, quoting *Rupf*, *supra*, 85 Cal.App.4th at p. 429, fn. 5.)  " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor

vigor with which that standard is applied varies with the determination whether a constitutionally protected right is involved." (*People v. Barksdale* (1972) 8 Cal.3d 320, 327.)  It is also true, however, that this same "higher standard[] of certainty" applies to penal statutes (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 60) and courts have still rejected vagueness challenges.  (See, e.g., *People v. Hamilton* (1998) 61 Cal.App.4th 149, 155 [weapon " 'use' "]; *People v. Kirk* (1975) 49 Cal.App.3d 765, 769 [" 'dangerous' "]; *People v. Agnello* (1968) 259 Cal.App.2d 785, 790 [" 'likely' "]; *People v. Johnson* (1964) 230 Cal.App.2d 80, 83-84 [" 'forbidden by law' "].)

evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

The record—viewed in a light most favorable to the ruling—shows Mary drank two shots of tequila and overdosed on Zofran and Percocet on August 24, 2014, after she was unable to get in touch with her boyfriend. Thereafter, she freely admitted to her daughter, the sheriff's deputy, and medical personnel she desired and purposely tried to kill herself because she believed nobody cared about her. (Cf. *Keil*, *supra*, 161 Cal.App.4th at 38 [appellant admitted threatening to kill himself].) As a result of her suicide attempt, Mary was transported to KMC, where she was given oxygen supplementation, intubated, and hooked up to a Narcan drip until her condition stabilized. Prior to the August 24th incident, she exhibited symptoms of depression for at least a decade and tried to kill herself in the same exact manner on four separate occasions. (Cf. *Jason K.*, *supra,* 188 Cal.App.4th at p. 1554 ["[A] single incident leading to a section 5150 commitment can support a section 8103, subdivision (f) finding."].) KMC staff diagnosed "[m]ajor depressive disorder severe without psychotic features" (*id.* at p. 1553; cf. *Keil*, *supra,* at p. 38 [" 'mild to moderate level of depression' "]) and opined Mary was likely to harm herself as a result of a mental health disorder. Yet, during her hospitalization and at the January 14, 2015, hearing, Mary insisted she had no psychiatric issues whatsoever, the August 24th incident was merely an accident, and she never attempted suicide in the past. The superior court could reasonably deduce " 'the circumstances leading to the section 5150 detention might occur again' " (*Jason K.*, *supra,* at p. 1554) and " 'possession or control of . . . weapons in such circumstance would pose a risk of danger to [Mary] or to others' " (*ibid.*). Thus, substantial evidence supported the court's conclusion that Mary would not be likely to use firearms in a safe and lawful manner.[10]

_____

[10]     Mary also claims the evidence did not establish she "was assessed by [a] designated professional person, admitted to a facility designated by the county and

15.

*V.   Mary is not entitled to appointed counsel on appeal.*

Mary argues appointment of counsel is appropriate on at least one of two bases: (1) Government Code section 27706, subdivision (d); and (2) procedural due process. The Attorney General disagrees.

We reject Mary's claims.  As to her first argument, Government Code section 27706, subdivision (d), reads:

> "Upon request, or upon order of the court, the public defender shall represent any person who is not financially able to employ counsel in proceedings under . . . Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code."

However, section 8103 is under Division 8 of the Welfare and Institutions Code. Therefore, Government Code section 27706 does not apply.  (See *Morton Engineering & Construction, Inc. v. Patscheck* (2001) 87 Cal.App.4th 712, 716 ["When statutory language is clear and unambiguous there is no need for construction, and we will not indulge in it."].)

As to Mary's second argument, while procedural due process "has been held to include the right . . . to appointed counsel under certain circumstances, regardless of whether the action is labelled criminal or civil" (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27), because such a right generally "has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation" (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 25 (*Lassiter*)), "as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel" (*id.* at p. 26).  "[W]hether [one] has a personal liberty interest that requires appointment of counsel . . . must be determined on a case-by-case basis . . . by applying a two prong-test." (*Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500, 1505 (*Iraheta*).)  First, the court conducts the three-factor

evaluated by the appropriate medical professionals."  (See *ante*, at pp. 10-11 & fns. 5-7.) Under the substantial evidence standard of review, the superior court could have reasonably inferred these facts from the medical record.

"fundamental fairness" balancing test.  (See *Lassiter*, *supra*, at pp. 24-25, 27; *Iraheta*, *supra*, at p. 1505.)  Second, the "net weight" of these factors are "set . . . against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom."  (*Lassiter*, *supra*, at p. 27; accord, *Iraheta*, *supra*, at p. 1505.)  "The dispositive question . . . is whether the three ['fundamental fairness'] factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel . . . ."  (*Lassiter*, *supra*, at p. 31.)  Given our earlier analysis under the "fundamental fairness" balancing test (see *ante*, at pp. 8-11) and this matter does not involve the deprivation of Mary's physical liberty, we cannot conclude procedural due process requires appointment of counsel.

## DISPOSITION

The order is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

17.